**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ellis BURRELL, Billy J. Henry, Jon P. Hammonds, William D. Hatch, John Jones, and Steven E. Williams, Defendants–Appellants.**

**Nos. 91–1808,\* 91–2089, 91–2090, 91–2091, 91–2113 and 91–2114.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 16, 1992.

Decided May 11, 1992.

Rehearing Denied June 10, 1992 in Nos. 91–2089 and 91–2091.

---

\* Case No. 91–1808 was submitted and decided on the briefs.

978

Richard N. Cox, Asst. U.S. Atty., Danville, Ill., for the U.S.

Wayne N. Horne, Gholar & Horne, Chicago, Ill., Caroline B. Briggs, Flora, Ind., for Ellis Burrell.

David S. Mejia, argued, Oak Park, Ill., Felix A. Vazquez, Chicago, Ill., for Steven E. Williams.

Charles E. Ruch, Jr., argued, Petersen, Deck, Ruch & Baron, Kankakee, Ill., for Billy J. Henry.

David J. Ryan, argued, Dukes, Martin, Helm & Ryan, Danville, Ill., for William D. Hatch.

Warren E. White, Asst. U.S. Atty., argued, Danville, Ill., for John W. Jones.

Reino C. Lanto, Jr., argued, Rantoul, Ill., for Jon P. Hammonds.

Before BAUER, Chief Judge, KANNE, Circuit Judge, and WOOD, Jr., Senior Circuit Judge.

BAUER, Chief Judge.

The appellants are six defendants convicted of various narcotics and firearm offenses. They raise a barrage of challenges to their convictions and sentences. Finding no merit in these challenges, we affirm.

## I. *Facts*

The defendants were arrested together in Bradley, Illinois, on drug possession, conspiracy, and firearm charges. The groundwork for the reverse-sting operation that led to the arrests began in September 1990. Cary Grant, an Illinois State Police Special Agent, posed undercover as "Jarne", a West–Indian marijuana dealer. Grant met Ralph Collier in Champaign, Illinois. Collier told Grant that some of his Chicago business associates were interested in buying marijuana. Collier arranged a meeting on September 21 between Grant and his Chicago partners at a McDonalds restaurant in Gilman, Illinois.

Grant rode with Collier to the audio-and-videotaped meeting. Steven Williams approached Collier's car and told Grant that he had to speak with Ellis Burrell, who was waiting in another car. After Grant joined Burrell, Jon Hammonds got into the car with Grant and Burrell. At Grant's request, Burrell told Hammonds to wait in Collier's car with Williams. Thus, Williams, Collier, and Hammonds waited in Collier's car, and Grant and Burrell talked in Burrell's car.

Burrell told Grant that his associates could sell 100 pounds or more of marijuana every other day. He warned Grant that he had two guns in the car because he and his associates were uneasy about the meeting. Burrell said that he and Williams usually sent a representative to such meetings. As Grant and Burrell talked, Williams (who acknowledged he was armed) joined them. Although Grant brought marijuana to the meeting to sell, the parties agreed to put off the transaction for at least a day. Burrell gave Grant his pager number and his home phone number so that Grant could reach him directly. Burrell, Williams, and Hammonds left the meeting together.

Negotiations proceeded by phone. A second meeting was arranged between Grant, Burrell, and Williams for September 27 at the Winfield Inn in Bradley, Illinois. At that meeting, Burrell and Williams agreed to buy 500 pounds of marijuana at $750 per pound. Grant agreed to front most of the marijuana on credit so long as Burrell and Williams paid a percentage of the purchase price on delivery. Burrell and Williams agreed to pay the balance of the price within a few days of delivery.

On September 30, in a three-way conversation, Burrell, Williams, and Grant firmed up the terms of the deal. Burrell and Williams still wanted the 500 pounds of marijuana. They grudgingly agreed to make at least a $50,000 down payment, and to make their best efforts to pay more. Williams wanted the deal to go down in his "ballpark." Grant, of course, wanted the deal to be in his territory. Williams reluctantly agreed to let Grant name the location.

Williams paged Grant late on October 1st or early on October 2nd. Williams confirmed that they would have a $50,000 to $85,000 down payment, and that they wanted the 500 pounds of marijuana. Williams still resisted leaving Chicago (where he felt safer) for Grant's territory in Bradley, Illinois. Nevertheless, Williams agreed to call Grant the following day to finalize the deal. Just before midnight the following night, Burrell paged Grant. In another three-way conversation, Burrell and Williams agreed to come to the Winfield Inn in Bradley, Illinois on October 4. Williams and Burrell were to show their money to Grant in Bradley, and Grant agreed to deliver the marijuana the next day in Chicago. Williams warned Grant that he and Burrell "wouldn't be coming alone." Trial Transcript (Tr.) at 332–33. Based upon his experience investigating drug dealing, Grant believed that Burrell and Williams, who are black, would have black bodyguards. All of the men who came with Burrell and Williams from Chicago are black.

Grant and fifteen concealed Illinois State Police Officers waited at the Winfield Inn for Burrell and Williams. At 2:30 p.m.,

Hammonds, accompanied by James Nettles, drove a 1990 Lincoln Continental into the motel parking lot. They slowly circled the lot, scanning the other vehicles in the lot and the surrounding area. Hammonds backed into a space at the south end of the lot, so the car faced north with a view of the lot. Nettles and Hammonds remained in their car.

Then William Hatch and Darren Clarke, driving a black Buick, pulled into the Moose Lodge parking lot located directly south of the Winfield Inn. They got out of the car. Clarke joined Hammonds and Nettles in the Lincoln. Hatch walked around the outside of the motel, and then entered the lobby through the front doors. Shortly after Hatch and Clarke arrived, Burrell and Williams arrived in a pinkish-white van. Williams drove around the motel parking lot for a moment before he parked. Grant left the lobby, and got into the van with Burrell and Williams.

Shortly after the van arrived, Billy Joe Henry and John Jones drove a Ford Taurus with a Chicago parking sticker into an Amoco gas station just north of the Winfield Inn parking lot. One of the police officers was also parked in the Amoco station, pretending to use the pay phone. The officer had parked facing east, and Henry parked just in front of him, facing west. The cars were about 200 feet from the van. Henry watched the van, and Jones scanned the surrounding area. During the fifteen-minute meeting in the van, Jones went into the gas station and bought some sodas and snack food. While walking to and from the station, he kept a close eye on the van.

Negotiations inside the van proceeded. Grant told Burrell and Williams that he had 641 pounds of marijuana from which they could select their 500 pounds. He showed them a "load sheet" that listed the available bales, and the weight per bale. Williams gave Grant $60,000 cash—all three counted it and put it in Grant's briefcase. Williams confirmed that the price was $750 per pound, and that the total price for 600 pounds would be approximately $450,000.

They agreed that Burrell and Williams would keep the money until Grant delivered the marijuana the following day. Grant mentioned that Burrell and Williams had brought their bodyguards with them and said he hoped no one would "stick [him] up". Government's Exhibit 9–1, at 6. Williams did not expressly acknowledge the presence of the bodyguards, but assured Grant, "It ain't gonna be, ain't gonna be all that." *Id.*

Grant left the van, ostensibly to get a sample of the marijuana, and the police moved in. They arrested everybody. Burrell and Williams were nabbed in the van. Burrell had a loaded 9mm pistol and 43 rounds of ammunition at his feet on the passenger side. Williams was carrying a .45 caliber pistol and a pager. The police found more ammunition and a 12 gauge pump shot gun in the van.

Hatch was arrested in the lobby about ten feet from the pay telephones. The police had seen Hatch with a gun in his hand while he watched the van from the lobby. They found a loaded 9mm pistol on the ledge of one of the phones. Nettles, Hammonds, and Clarke were arrested as they sat in the Lincoln. Although Hammonds and Clarke were unarmed, Nettles had a loaded 9mm pistol.

Henry and Jones were still sitting in the Taurus when they were arrested. Police found another loaded 9mm pistol on the front seat of the Taurus, and a loaded .38 caliber revolver on the floor on the passenger side. Jones had more ammunition for the .38 caliber in his pocket. Henry had one of Jones's business cards in his pocket.

The district court admitted telephone records offered by the government which showed calls between Williams, Burrell, Hatch, and Jones. The records also indicated calls may have been made to Hammonds. Just prior to final arguments, the court allowed the jury to examine the firearms seized during the defendants' arrests. All the guns had been admitted into evidence. They were passed from juror to juror as they sat in the box, and then they were collected. The guns were not sent back to the jury room during deliberations.

All the defendants were charged with various drug and firearms offenses. Count one charged each with conspiracy to possess with intent to distribute 500 pounds of marijuana in violation of 21 U.S.C. § 846. Count two charged them with attempted possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Counts three and four charged Burrell with using and carrying firearms during a drug offense in violation of 18 U.S.C. § 924(c). Williams was also charged under count four. Count five charged Williams with using and carrying a firearm (in addition to the one charged in count four) in connection with a drug offense. Count six charged Burrell with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Counts seven, eight, and nine charged Hatch, Henry, and Jones, respectively, with using and carrying firearms during a drug offense.

Nettles and Collier pleaded guilty before trial and have not appealed. Clarke was tried and acquitted by the court at the close of the government's case. Burrell pleaded guilty to counts one and three of the indictment and was sentenced to a term of 97 months under count one. He also received a five-year term of supervised release to follow his incarceration. After a jury trial, the remaining defendants were found guilty of all the counts with which they were charged. Each defendant raises a number of challenges to his conviction or sentence, and some object to both. We shall first consider the defendants' common claims, and then each defendant's individual claims.

## II. *Common Claims*

### A. Jury's Handling of Firearms Caused Undue Prejudice

Henry, Hatch, Hammonds, Jones, and Williams contend that the district court erred when it allowed the jury to handle the defendants' firearms just prior to closing arguments. All four rely on the argument in Hatch's Brief. All the firearms were admitted into evidence and shown to the jury individually. The defendants concluded their cases on Friday; prior to clos-ing arguments on Monday, the district judge had the bailiff pass all the guns to the jury. Apparently the judge routinely allows the jury to examine things like drugs and guns in the jury box before deliberations. Tr. at 689–90.

Henry, Hatch, Hammonds, Jones, and Williams argue that giving the guns to the jury constituted an improper appeal to their passion and prejudice. They assert that the prejudice resulting from the jury's handling of the firearms was not counterbalanced by it's probative value because it provided no insight into any of the defendants' participation in the conspiracy. They also argue that because the jury was confronted with the weapons as a group, it was "all but forced to conclude that all the defendants were part of one conspiracy." Hatch's Brief at 18.

■ The district court has considerable discretion in the handling of exhibits during the course of the trial as well as during jury deliberations. *United States v. Venerable*, 807 F.2d 745, 747 (8th Cir. 1986); *United States v. DeCoito*, 764 F.2d 690, 694–95 (9th Cir.1985). Therefore, we review the district court's handling of the exhibits for a clear abuse of discretion.

In *United States v. Thomas*, 521 F.2d 76, 81–82 (8th Cir.1975), during its deliberations the jury asked to see the defendant's signed confession, one of the government's exhibits. The court sent all of the exhibits, including the gun the defendant allegedly used in the charged offense, to the jury room. The Eighth Circuit explained that the "management of exhibits lies in the sound discretion of the trial judge, and an appellate court will not interfere unless there has been a clear abuse of discretion." *Id.* at 82. The court ruled that the judge's handling of the exhibits was proper.

■ We do not believe the trial judge abused his discretion by allowing the jury to handle the defendants' guns before closing arguments. All the weapons had been admitted into evidence. Even assuming that there was a possibility that such a display of firepower might have prejudiced the jury, we do not think it was so great

that the treatment of the weapons was a clear abuse of discretion. The jury is entitled to examine carefully all the evidence in order to understand fully the events at issue. To eliminate any chance of accident, weapons are generally not sent to the jury room. Nonetheless, the jury's physical examination of the weapons allegedly used in a crime is proper, and a court that allows it does not abuse its discretion.

■ We also note that because the district judge routinely managed exhibits in this way, we find no merit in the defendants' assertion that the court was attempting to bolster the government's conspiracy evidence in this particular case by handing the guns to the jury in a group. *See* Hatch Br. at 17–18.

### B. Propriety of Court's Conspiracy Instruction

Hammonds, Henry, Hatch, and Jones contend that the court's jury instruction on conspiracy was confusing and did not accurately reflect the law. All four defendants rely upon the argument made in Hammonds's Brief. Hammonds argues that there was a "flaw" in the judge's instruction, and quotes the following portion:

> ... In determining whether a defendant becomes a member of the conspiracy, you must do so based on the acts or statements of that particular defendant .... You may consider these statements when you decide whether each defendant joined the conspiracy .... You cannot decide that a defendant joined the conspiracy based solely on what someone else said or did....

Hammonds's Brief at 12–13. Hammonds argues that the second sentence contradicts the first, and "clearly tells the jury that it *can* consider the co-conspirators' statements *in the process of* ('when') deciding if Hammonds joined the conspiracy...." *Id.* In other words, Hammonds and his co-defendants argue, the instruction did not distinguish between the initial determination that the defendants joined the conspiracy (where only the individual's acts may be considered), and the subsequent determination of liability for acts committed by

the conspiracy (where all the conspirators' acts may be considered). Hammonds's Brief at 13.

We explored the importance of this distinction in *United States v. Martinez de Ortiz*, 907 F.2d 629, 635 (7th Cir.1990) (en banc), *cert. denied*, —— U.S. ——, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). This court suggested an instruction that we believed would help the jury understand the distinction between the two issues:

> During the trial you heard about statements made by persons who the prosecutor says are the defendant's fellow conspirators. You may consider these statements when you decide whether the defendant joined the conspiracy. Please remember, however, that only the defendant's own words and acts show whether he joined. You therefore should use statements by other persons to decide what the defendant did and said, or to help you understand the defendant's acts and words. If you decide that the defendant joined the conspiracy, you may use the statements by other persons in order to decide questions that are pertinent to the other accusations against him.

*Id.* at 635. The district court's instruction mirrored the approved *de Ortiz* instruction.

■ The "flaw" in Hammonds's argument is his omission of the intervening and successive material in the district court's instruction. The entire instruction was:

> In determining whether a defendant becomes a member of the conspiracy, you must do so based on the acts or statements of that particular defendant. [During the trial you heard evidence about statements and conversations by persons who the government charges are fellow conspirators with each of the defendants.] You may consider these statements when you decide whether each defendant joined the conspiracy. [Please remember, however, as I just told you, that only a defendant's own words or acts show whether he joined, and] you can not decide that a defendant joined the conspiracy based solely on what someone else said or did. [But in deciding what a defendant did or said, or

to help you understand what a defendant did or said, you may take into consideration the statements by other persons.]

Hatch's Appendix at 32; Tr. at 814–15. The bracketed material reflects the sentences Hammonds omitted in his quotation of the instruction. We do not believe that the district court's instruction fails to distinguish between the questions of joining the conspiracy and liability for the conspiracy's acts. Furthermore, even if we believed the district court's instruction failed in this regard, we have noted in earlier cases that a conspirator's declarations may be evidence that the defendant joined and participated in a conspiracy. *Martinez de Ortiz*, 907 F.2d at 633; *United States v. Rodriguez*, 929 F.2d 1224, 1229 (7th Cir. 1991).

 Hammonds proposed an instruction that was taken verbatim from *United States v. Auerbach*, 913 F.2d 407, 416–17 (7th Cir.1990). He argues that the verbatim instruction "eliminates the possibility of jury confusion," while "the Court's instruction virtually invited—if not insured such confusion." Hammonds's Brief at 13. This argument is simply without merit. *See United States v. Romo*, 914 F.2d 889, 893 (7th Cir.1990) (rejecting similar claim), *cert. denied*, —— U.S. ——, 111 S.Ct. 1078, 112 L.Ed.2d 1183 (1991). The trial court's instruction tracks the language we approved in *de Ortiz*. The trial court need not give a proposed instruction if the essential points are covered by the instruction given. *United States v. Penson*, 896 F.2d 1087, 1090 (7th Cir.1990). A district court has substantial discretion with respect to the specific wording of jury instructions. *Id.* Therefore, we find there was no error and no prejudice generated by the district court's instruction. Further, we do not appreciate Hammonds's selective quotation of the district court's instruction.

### III. *Individual Claims*

We shall analyze the defendants' individual challenges in the order in which they are named in the case caption.

## A. Ellis Burrell

Burrell pleaded guilty to conspiracy to distribute marijuana and carrying a firearm during a drug offense. He argues that he is entitled to a downward departure in his sentence because of the substantial assistance he rendered the government and the dangers he and his family encountered as a result of his guilty plea. Burrell contends that a co-defendant, Ralph Collier (who is not before us in this appeal) pleaded guilty as a result of his (Burrell's) plea.

Section 5K1.1 of the Sentencing Guidelines provides that "[u]pon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." Burrell contends that his role in Collier's guilty plea constituted substantial assistance to the government, and that he was entitled to a downward departure notwithstanding the government's failure to move for one. He buttresses his claim by recounting the harassment to which he and his family were subjected as a result of the public perception, based upon the plea, that he was a "snitch."

Burrell argues that (1) the court should have considered making a downward departure under § 5K1.1 of the Sentencing Guidelines despite the lack of a motion by the government and (2) "there is evidence that [the] prosecution breached its agreement since it not only failed to move for departure but actually recommended the maximum allowed by law pursuant to the plea of guilty. In essence, Burrell received nothing for his plea of guilty." Burrell's Brief at 14.

We have recently considered whether a court has the authority to impose a lesser sentence based upon a defendant's assistance to the government under § 5K1.1 without a motion from the government. *See United States v. Smith*, 953 F.2d 1060 (7th Cir.1992). In *Smith*, the district court found that a government motion is a "threshold hurdle". *Id.* at 1062. Smith argued that if the government's refusal to make a motion is arbitrary, a district judge

may depart without a motion. *Id.* at 1063. We found, however, that the prosecutor's power to make or withhold a § 5K1.1 motion is a form of prosecutorial discretion, which is not reviewable for arbitrariness. We held that § 5K1.1 fully covered the terms of departure for assistance to the prosecution, and that Congress made departure on these grounds contingent upon a motion from the prosecutor. *Id.* at 1063.

■ We rejected Smith's contention that the Constitution requires that § 5K1.1 permit departure if the prosecutor's failure to make a motion is arbitrary or in bad faith. *Id.* We rejected this claim because the prosecutor's power to make or withhold a motion is analogous to other prosecutorial opportunities to affect a defendant's fate. For example, the decisions to charge a greater or lesser offense, to accept or refuse a plea bargain, or to consent to a bench trial, do not require explanation or justification. *Id.* at 1064. Because a refusal of this kind would result in "a trial according to the law and the Constitution[,] [a] verdict and sentence under those rules cannot be called unjust. There is no right to lenity." *Id.* at 1064.

■ A prosecutor's refusal to request a downward departure is analogous—the defendant is sentenced within the range established by law for the offense he has committed. "Failure to move for a reduction is the back end of the decision to select a particular statute under which to prosecute." *Id.* at 1065. This decision is not reviewable for arbitrariness or bad faith. The prosecutor, not the court, is to assess the value of the defendant's assistance. "Deciding whether to make a § 5K1.1 motion is fundamentally like deciding to prosecute on lesser charges persons who provide more assistance. Such decisions are not reviewable for arbitrariness, and neither is the prosecutor's decision not to file a substantial-assistance motion. Failure to make a motion accordingly may be reviewed only on the grounds applicable to other exercises of prosecutorial discretion." *Id.* at 1065–1066.

■ We noted, however, that if a prosecutor promises a defendant to make a § 5K1.1 motion in exchange for a guilty plea, and then welshes on the bargain, a different rule applies. "[A] guilty plea induced by an unkept bargain is involuntary. So if the prosecutor makes and does not keep a promise to file a § 5K1.1 motion, and the promise is material to the plea, the court must allow the defendant to withdraw the plea and start over." *Id.* at 1066.

■ Burrell contends that the court should have departed without the motion, which as we have explained, it cannot do. He also argues that the government violated his plea agreement by refusing to move for departure and recommending the maximum sentence under the Guidelines. But the agreement did not require the government to move for departure in exchange for Burrell's guilty plea. The government agreed to dismiss counts two, four, and six, and "in its sole discretion" to move for departure if "defendant provides substantial assistance." Plea Agreement, Pleadings Volume II, Document 120. Thus, there was no breach of the agreement. The counts were dismissed, and the government was not obligated to move for departure pursuant to § 5K1.1. Further, Burrell does not argue that the government's refusal was based on racial, religious, or other forbidden grounds. The government's refusal to move for departure pursuant to § 5K1.1 was within its prosecutorial discretion, and Burrell's appeal is denied.

### B. Billy Joe Henry

Henry was the driver of the Ford Taurus parked in the Amoco parking lot. He moved to quash his warrantless arrest and suppress the evidence seized during the arrest. After an evidentiary hearing, the trial court denied these motions. Henry was convicted of attempting to possess marijuana with intent to distribute, conspiring to possess and distribute marijuana, and carrying a firearm during a drug offense. The district court denied Henry's post-trial motions for acquittal, which renewed the complaints raised in the motions to quash and suppress, and his motion that challenged the sufficiency of the evidence.

He was sentenced to two concurrent sixty-month terms under counts one and two, and a consecutive sixty-month term under count eight.

On appeal, Henry raises four arguments: (1) that the trial court erred in refusing to quash his arrest and suppress the evidence obtained in the ensuing search; (2) there is insufficient evidence to support any of his convictions; (3) he was unduly prejudiced by the court's decision to allow the jury to handle the defendants' firearms just prior to final arguments; and (4) the court's conspiracy instruction was confusing and did not accurately reflect the law. We have already discussed and dismissed arguments three and four, above. We shall discuss the remaining two in turn.

### 1. Probable Cause for Arrest

■ Henry argues that the district court should have quashed his arrest and suppressed the evidence obtained from the ensuing search because the arrest was not supported by probable cause. We will uphold the factual findings made by a trial court at a suppression hearing unless they are clearly erroneous. *United States v. Colonia*, 870 F.2d 1319, 1322 (7th Cir.1989).

> There exists a difference of opinion among the judges of this court as to the appropriate standard of review applicable to Fourth Amendment determinations of probable cause and reasonableness.... In reviewing Fourth Amendment determinations of probable cause and reasonableness in the nonwarrant context, this court has verbalized conflicting standards of review. On some occasions, this court has stated that "a district court's denial of a motion to suppress evidence will not be disturbed unless the decision was clearly erroneous." On other occasions, this court has explained that legal determinations made in a suppression hearing, such as the question of whether circumstances found by a district court meet the Fourth Amendment standard of reasonableness, are subject to *de novo* review.

*United States v. Holifield*, 956 F.2d 665, 667 (7th Cir.1992) (citations omitted).

■ We believe Henry's arrest (as well as the others at issue in this case) withstands either form of review, and therefore hold that the district court properly denied Henry's motion to suppress. "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1989). "The inquiry into the existence of probable cause raises questions of 'probabilities ... the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Brinegar v. United States*, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879 (1949)). "Probable cause requires more than bare suspicion but need not be based on evidence sufficient to support a conviction, nor even a showing that the officer's belief is more likely true than false." *Id.* "The constitutional validity of a warrantless arrest ... depends upon the probable cause to effectuate the arrest under the totality of the circumstances." *United States v. Colonia*, 870 F.2d 1319, 1322 (7th Cir.1989) (citing *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)). *See also United States v. Chaidez*, 919 F.2d 1193, 1197 (7th Cir.1990). "The relevant inquiry is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts." *Colonia*, at 1323.

The Ninth Circuit noted in *United States v. Hillison*, 733 F.2d 692, 697 (9th Cir. 1984), that "[i]n order to find probable cause based on association with persons engaging in criminal activity, some additional circumstances from which it is reasonable to infer participation in a criminal enterprise must be shown." In *United States v. Ingrao*, 897 F.2d 860 (7th Cir. 1990), for example, we overturned the district court's finding of probable cause because it was supported only by the defen-

dant's location—he carried a gym bag up the same gangway used by a suspected drug trafficker. *Id.* at 861. The gangway was shared by at least two homes, one was the drug traffickers', but agents arresting Ingrao could not see which home he came from. "Other than using the same walkway as that used by [the known trafficker] and the unknown man, there remains no connection between Ingrao and any of the alleged criminal activities." *Id.* at 863. We found the gangway connection insufficient to support a probable cause determination.

■ Henry argues that *Ingrao* requires that his arrest be quashed. There was far more in this case, however, than the mere physical proximity found wanting in *Ingrao*. These facts taken together supply probable cause for Henry's arrest. Henry and Jones arrived almost immediately after Burrell and Williams pulled into the Winfield Inn parking lot. Henry drove a car from Chicago; the arresting officer knew Burrell and Williams were coming from Chicago, and were bringing protection. Henry parked only 200 feet from the van, in a position where he could see it, and scan the surrounding area. In fact, Henry parked just six feet from the undercover officer who ultimately arrested him. Henry and Jones constantly watched the van and the area around the motel. A reasonably prudent person could conclude that Henry was involved in the drug transaction. Thus, the district court properly refused to quash the arrest and suppress the evidence.

### 2. Sufficiency of the Evidence

■ When a defendant argues that there was insufficient evidence of his guilt, he faces a formidable burden. We review all the evidence in the light most favorable to the government. If we find that any rational jury could have found the defendant guilty, the conviction will be affirmed. *United States v. Jewel,* 947 F.2d 224, 231 (7th Cir.1991).

Defendants Henry, Hammonds, Hatch, and Jones challenge the sufficiency of the evidence underlying their conspiracy and attempt convictions under counts one and two. These counts charge violations of 21 U.S.C. §§ 841(a) and 846. Hatch, Henry, and Jones also were charged with carrying a firearm during a drug offense in violation of 21 U.S.C. § 924(c). They correctly contend that if the evidence underlying the conspiracy and attempt convictions is insufficient, then the firearm convictions must also be reversed. We shall set out the law regarding sufficiency of the evidence in conspiracy cases at length in this, our first discussion of the issue, and rely upon it when we consider each defendant's challenge.

Henry concedes that he joined the group and knew "something bad was going to happen which was why he had a gun at the Amoco gas station...." Henry's Brief at 24–25. Nevertheless, he argues that there was insufficient evidence to prove that he joined the conspiracy to purchase marijuana. He states that he and Defendant Jones's activities were inconsistent with their purported role as bodyguards—they were 200 feet from the van, and Jones went into the gas station and bought snack food during the transaction. Henry places particular weight on the lack of phone records tying him to the other defendants. Henry also argues that the money is "ambiguous," and that his presence in Bradley only indicated that he was there to protect the money, not to conspire to purchase and distribute marijuana.

■ Henry's contention that the government must prove he joined the agreement to purchase the marijuana is correct. There must be substantial evidence that a particular defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement. *United States v. Durrive,* 902 F.2d 1221, 1229 (7th Cir.1990); *United States v. Baker,* 905 F.2d 1100, 1108 (7th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 206, 112 L.Ed.2d 167 (1990); *United States v. Wexler,* 838 F.2d 88, 91 (3d Cir.1988). Our recent adoption of a distinct standard for reviewing sufficiency of the evidence claims in conspiracy cases does not imply, however, that the standard of re-

view differs substantively from that employed when reviewing sufficiency claims in other types of cases. Rather, it merely reflects our concern that the prosecution's burden in conspiracy cases not be relaxed. [S]ubstantial evidence is merely evidence of sufficient quantity and quality to support the jury's verdict.

*United States v. Auerbach*, 913 F.2d 407, 414 n. 6 (7th Cir.1990). We accept circumstantial evidence as support, even sole support, for a conviction. *Durrive*, 902 F.2d at 1229; *United States v. Townsend*, 924 F.2d 1385, 1390 (7th Cir.1991). "If the prosecution presents enough circumstantial evidence to support, beyond reasonable doubt, an *inference* that the defendants agreed among themselves to distribute drugs, a jury would be justified in convicting these defendants of conspiring together." *Id.* at 1390 (emphasis in original).

"We have emphasized in the past as we do now that a defendant's mere knowledge of, approval of, association with, or presence at a conspiracy standing alone is insufficient to establish membership in the conspiracy." *Durrive*, 902 F.2d at 1225. (citations omitted). Still, presence is a material and probative factor which the jury may consider in reaching its decision. The jury also may consider overt acts in furtherance of the conspiracy as circumstantial evidence establishing knowing participation in a conspiracy. *United States v. Hernandez*, 896 F.2d 513, 518 (11th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 159, 112 L.Ed.2d 125 (1990).

Finally, when the government's case is built largely on circumstantial evidence, it is not required to exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond reasonable doubt. Ultimately, the trier of fact must be free to choose among various reasonable constructions of the evidence. *United States v. Atterson*, 926 F.2d 649, 656 (7th Cir.), *cert. denied sub nom., Laurelez v. United States*, — U.S. —, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991).

In *United States v. Zafiro*, 945 F.2d 881, 888 (7th Cir.1991), *cert. granted*, — U.S. —, 112 S.Ct. 1472, 117 L.Ed.2d 617 (1992), we considered a claim similar to that raised in the instant case. The defendant was convicted as part of a group on a narcotics conspiracy charge. The defendant was arrested with her boyfriend and his associate as they carried a box containing 55 pounds of cocaine into her apartment. *Id.* at 884. Authorities found another 20 pounds of cocaine in a suitcase in the defendant's apartment. She argued that there was insufficient evidence to support her conspiracy conviction, and that she did not know the suitcase or the box contained cocaine. *Id.* at 888. The government's expert testified that drug traffickers do not discuss or deliver large quantities of drugs in the presence of innocent bystanders. We also found it unlikely that the traffickers would leave thousands of dollars worth of cocaine in the defendant's apartment without telling her what it was. Because the defendant did not contradict the expert's testimony and provided no contrary evidence, we found there was sufficient evidence to conclude that she knew her apartment was being used to stash cocaine. Therefore, we found her conspiracy conviction amply supported. *Id.*

Another recent case involving a cocaine ring provides further guidance for analyzing the degree of evidence required to tie a defendant to a conspiracy. *United States v. Duarte*, 950 F.2d 1255 (7th Cir.1991). Duarte shared a hotel room with another defendant who was arrested as he traveled to a second hotel room where just over a kilo of cocaine was stashed. More than 100 phone calls were made from Duarte's room in a two-day period, which we found is not inconsistent with the activities of a cocaine distribution ring. *Id.* at 1259. Duarte also carried a pager. The defendant who drove back and forth to the stashed cocaine parked just outside Duarte's room, and communicated with the occupants of the room by throwing something at the room's door. Further, a government expert stated notes found in Duarte's wallet were records of drug transactions.

The court found that Duarte's behavior created a "cloud of suspicion surrounding

his presence in Milwaukee," that could cause a rational juror to question his explanation of his activities. *Id.* Although Duarte contended he was an agent booking musical acts, he could name only one nightclub in Milwaukee. Moreover he could not name a single client he managed. This coupled with his evasive behavior, and false information given to the police and the hotel, the court found entitled the jury to believe Duarte was hiding something, and to infer that the something was his participation in the cocaine conspiracy. *Id.* at 1260.

■ To be liable as co-conspirators, defendants must be mutually dependent on one another, or must render mutual support. *See United States v. Percival*, 756 F.2d 600, 607 (7th Cir.1985); *United States v. Cerro*, 775 F.2d 908, 914 (7th Cir.1985). "A conspiracy 'is a partnership in criminal purposes,' *United States v. Kissel*, 218 U.S. 601, 608 [31 S.Ct. 124, 126, 54 L.Ed. 1168] (1910), and '[c]onspirators, like all business ventures, are mutual agents.' *United States v. Martinez de Ortiz*, 907 F.2d 629, 632 (7th Cir.1990) (en banc). Conspiracies, like all business ventures, are typically distinguished by cooperative relationships between the parties that facilitate achievement of the goal."

*United States v. Townsend*, 924 F.2d 1385, 1395 (7th Cir.1991). *Townsend* involved seven defendants who were convicted of conspiring together to possess and distribute narcotics. The government indicted nineteen people—everyone who discussed drugs on the telephone with either of the principal targets. *Id.* at 1388. Of the seven who appealed, four were suppliers, two were purchasers, and the seventh was married to one of the principals. We refused to find that the loose associations between narcotics purchasers and suppliers supported a finding of a single conspiracy. *Id.* at 1396.

■ The government argued that because each defendant dealt with someone they knew was a large-scale dealer, each defendant supported, and therefore conspired with the others with whom the large-scale dealer dealt. *Id.* at 1390. We found this logic unpersuasive, because, taken to its extreme, it suggests that any one buying or selling drugs from any one of the defendants also could be convicted of conspiracy. This argument stretched "the boundaries of conspiracy law to the breaking point." *Id.* at 1391. In order for all the members of the distribution chain to be liable, participants at different levels in the chain must know that the success of those at each level depends upon the success of the others and, therefore, cooperate for their mutual benefit. *Id.* In other words, the government must prove "a participatory link" between the defendant and the conspiracy. *United States v. Navarez*, 954 F.2d 1375, 1381 (7th Cir.1992).

Although the conspiracy here involves a single link in a narcotics distribution chain, we believe *Townsend* provides some analytical guidance. We shall also rely upon the principles set forth in *Duarte* and *Zafiro*. The important factors are the participants' knowledge, mutual responsibility and cooperation. These factors are more difficult to establish when individual buyers and sellers are involved (such as in *Townsend*) because the assumption is "market transactions—whether in legal or illegal markets—benefit both parties, but we do not assume, *ab initio* that they carry with them the excess baggage of conspiracy." *Id.* at 1392. In the instant case, however, it is easier to establish mutual benefit and cooperation because the defendants were acting as a single economic unit—large-scale purchasers of narcotics. We shall return to these principles as we discuss each defendant's sufficiency of the evidence challenge.

■ We believe there was sufficient evidence that Henry joined Burrell and Williams's conspiracy to possess and distribute marijuana. He arrived in Bradley, Illinois, just after Burrell and Williams, and parked in a strategic location to watch their meeting with Grant. The utility of the location is firmly established—Henry parked right next to one of the undercover police officers. Henry was armed, and carried Jones's business card in his wallet.

He and Jones constantly watched the van and scanned the surrounding area.

Henry argues that because there was no evidence of telephone calls between he and the other participants, there is no evidence of his agreement to join the conspiracy. We disagree. Although mere association or presence at the scene where a conspiracy's activities occur will not support a charge that the defendant joined a conspiracy, Henry did more than merely appear at the scene of a drug deal. He drove approximately two hours from his home to the Winfield Inn in Bradley, Illinois. He came armed, and arrived as part of a caravan of bodyguards. He carried Jones's business card in his pocket, and constantly watched the van. Viewing this evidence in the light most favorable to the government, we believe that the jury could infer not just that he knew something "bad" was happening, as he contends, but that Henry knew that a drug deal was going down, and agreed to be a part of it. Therefore, we find his sufficiency of the evidence challenge to the conspiracy and attempt charges without merit.

The sole basis of Henry's sufficiency challenge to his conviction for using a firearm in the commission of a drug trafficking offense was that he did not commit the trafficking offenses. Because we have found that there was sufficient evidence for those offenses, we also dismiss this challenge. We also dismiss his remaining challenges to the jury's handling of the weapons and the trial judge's conspiracy instruction, based upon our treatment of those issues above.

## C. Jon Hammonds

Hammonds was the driver of the 1990 Lincoln Continental, the first car to arrive at the Winfield Inn. He pulled into the parking lot at around 2:30 p.m., circled for a few moments, and scanned the other cars in the lot and the surrounding area. Hammonds parked his car facing north, with a view of the lot. Hammonds was accompanied by Nettles (who pleaded guilty), and joined by Clarke (whose case was dismissed), who arrived with Hatch. Hammonds was not armed when arrested. Hammonds also had accompanied Burrell and Williams to the initial face-to-face meeting with Grant at the McDonalds in Gilman, Illinois. Phone records admitted by the district court indicated that some calls may have been made between Hammonds, Williams, and Burrell.

Hammonds raises six challenges to his conviction. He argues: (1) the district court erred in denying his motion to quash his arrest and suppress the evidence obtained in the ensuing search; (2) there was insufficient evidence to prove Hammonds knew that he was acting in furtherance of a marijuana conspiracy on October 4, 1990, in Bradley, Illinois; (3) the jury's examination of the guns just prior to closing arguments was unfairly prejudicial; (4) the court's jury instruction on conspiracy was erroneous; (5) the court erred in denying Hammonds's motion in limine to exclude his prior felony conviction for possession of controlled substances; and (6) the court erred in overruling his objection to the government's information seeking imposition of a mandatory ten year sentence under 21 U.S.C. § 851(a)(2).

Hammonds's third and fourth arguments are dismissed pursuant to our discussion above. We shall discuss his other challenges in turn.

### 1. Probable Cause

Like Henry, Hammonds argues that the district court should have quashed his arrest and suppressed the evidence obtained from the arrest because it was not supported by probable cause. We rely upon our legal analysis of Henry's claim to examine Hammonds's claim. "Probable cause for an arrest exists if, at the moment the arrest was made, the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent person in believing that an offense has been committed." *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990).

We believe there was probable cause for Hammonds's arrest. He attended the initial meeting between Grant and Burrell and Williams, and acted as a lookout. He was the first driver to arrive at the Winfield Inn. He circled the lot, scanned the area, and parked in a strategic position with a view of the lot. He kept an eye on the van during the meeting. Neither he nor his passenger left the car. In addition, another man who arrived shortly thereafter in another car, got into Hammonds's car. Based upon these facts, a reasonably prudent person could conclude that Hammonds was a participant in the marijuana sale. It certainly did not appear that he was a patron of the motel or the surrounding businesses. He was not merely in physical proximity to the illegal conduct like the defendant in *Ingrao*, 897 F.2d at 861. We find there was probable cause for Hammonds's arrest. Therefore, the district court properly denied his motions to quash and suppress.

## 2. Sufficiency of the Evidence

■ Hammonds also challenges the sufficiency of the evidence underlying his conviction. Nevertheless, we hold that there is sufficient evidence to uphold the jury's verdict. Hammonds accompanied Burrell and Williams to their first meeting with Grant. Phone records indicated that Burrell called Hammonds on the morning of October 4, 1990. Hammonds was the first driver to arrive at the Winfield Inn, and his companion was armed. Hammonds circled the parking lot, and backed into a space that afforded him a clear view of the lot. A passenger from another car got into Hammonds's car when he arrived at the Inn. As Hammonds waited in his car, he and his associates constantly watched the van containing Burrell, Williams, and Grant, as well as the surrounding area.

Reviewing this evidence in the light most favorable to the government, we believe a rational jury could conclude that Hammonds was a knowing participant in the marijuana sale. Telephone toll records showing the phone call on the morning of October 4 to Hammonds, together with Hammonds's presence at the first face-to-

face meeting between the principals could have convinced the jury that he knew the reasons for the meetings, and played an active role as a look-out at each of them. Viewed as a whole, the government presented sufficient evidence from which a rational jury could find Hammonds guilty of conspiracy and attempt to purchase marijuana with intent to distribute.

## 3. Motion in Limine

Hammonds next argues that the court erred in denying his motion in limine to exclude his prior felony conviction for possession of controlled substances. In 1987, Hammonds was convicted of felony possession of a controlled substance in Cook County, Illinois. He filed a motion in limine to prevent the government from using this conviction to impeach his testimony. Applying Federal Rule of Evidence 609(a), the court denied the motion because it found that the probative value of the evidence outweighed its prejudicial effect on the accused. Hammonds asserts that he chose not to testify to avoid the prejudicial effect the prior conviction might have on the jury. He now contends that the trial judge erred in denying his motion.

■ Hammonds has not preserved this issue on appeal. A defendant who does not testify at trial is not entitled to review of a district court's denial of his motion in limine. *Luce v. United States*, 469 U.S. 38, 39, 105 S.Ct. 460, 462, 83 L.Ed.2d 443 (1984). In *Luce*, the Court reasoned that "[a]ny possible harm flowing from a district court's *in limine* ruling permitting impeachment by a prior conviction is wholly speculative. The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer." *Id.* at 41, 105 S.Ct. at 463.

The Court found that the handicap created by ruling on the subtle evidentiary question without a factual context, i.e. testimony at trial, prevented meaningful review. It also found that "[r]equiring a defendant to make a proffer of testimony is no answer; his trial testimony could, for

any number of reasons, differ from the proffer." *Id.* at 41, n. 5, 105 S.Ct. at 463, n. 5. The difficulty is complicated further because "a reviewing court cannot assume that the adverse ruling motivated a defendant's decision not to testify." *Id.* at 42, 105 S.Ct. at 463. Therefore, the Court held that to preserve a claim of improper impeachment with a prior conviction, the defendant must testify. *Id.* at 43, 105 S.Ct. at 464. *See also United States v. Doyle*, 771 F.2d 250, 255 (7th Cir.1985) (applying *Luce*). Because Hammonds did not testify at trial, he has failed to preserve his challenge to the district court's ruling on his motion in limine.

### 4. Sentencing Challenge

■■■ Hammonds contends that the district court erred in overruling his objection to the government's information seeking imposition of a mandatory ten year sentence based upon his prior narcotics conviction. The court imposed the mandatory sentence. Hammonds argues that the ten-year minimum sentence was unauthorized because 21 U.S.C. § 851(a)(2) requires that the prior conviction be the result of prosecution by indictment, or that the defendant waived indictment.

Section 851(a)(2) provides: "An information may not be filed under this section if the increased punishment which may be imposed is imprisonment for a term in excess of three years unless the person either waived or was afforded prosecution by indictment for the offense for which such increased punishment may be imposed." Hammonds contends that § 851(a)(2) refers to the prior conviction (on which the enhancement is based), not the conviction for which the enhanced sentence is sought. Thus, he argues, because his state conviction did not proceed by indictment, it cannot be used to enhance his sentence. This appears to be a question of first impression in this circuit. Two other circuits, however, have held that subsection (2) refers to the conviction for which the enhancement is sought, i.e. the current conviction. *United States v. Adams*, 914 F.2d 1404, 1407 (10th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990); *United*

*States v. Espinosa*, 827 F.2d 604, 616–17 (9th Cir.1987), *cert. denied*, 485 U.S. 968, 108 S.Ct. 1243, 99 L.Ed.2d 441 (1988).

In *Espinosa*, the defendant challenged a five-year sentence enhancement, arguing that the requirement for prosecution by indictment referred to the prior conviction. The Ninth Circuit properly refused to credit this argument. It explained that "although one may not be punished twice for the same crime, punishment for a second crime may be enhanced by reason of a second conviction." *Id.* at 617. Thus, it concluded that a "common sense" reading of "the offense for which such increased punishment may be imposed" is the current, or most recent offense. *Id.* The court also pointed out that other usages of "offense" in the section refer to the current offense, and earlier convictions are called "prior" and "previous convictions." *Id.* We find the Ninth Circuit's reasoning entirely persuasive, and adopt the same view.

The Tenth Circuit, relying upon *Espinosa*, reached the same conclusion. *United States v. Adams*, 914 F.2d 1404, 1407 (10th Cir.), *cert. denied*, — U.S. —, 111 S.Ct. 588, 112 L.Ed.2d 593 (1990). In addition, it pointed out the ridiculousness of the reading urged by Hammonds. The statute requires indictment or waiver for "the offense for which such increased punishment may be imposed." *Id.* Hammonds interpretation would require an *ex post facto* increase in the punishment for a past, prior offense. This obviously is not permissible. But it is permissible to increase the severity of punishment for the current offense based upon the defendant's record. *See Adams*, 914 F.2d at 1407.

Hammonds argues that the *Espinosa* interpretation of § 851(a)(2) is untenable because it would render the questioned language mere surplusage. Because the Fifth Amendment and the Federal Rules of Criminal Procedure require all federal felony prosecutions to proceed by indictment, there is no need to highlight that requirement in the sentencing statute. Although this application of the familiar maxim of statutory construction is not without its

appeal, we do not believe it trumps the careful reasoning set forth in *Adams* and *Espinosa*.

Accordingly, we accept the Ninth and Tenth Circuits' interpretation of § 851(a)(2), and dismiss Hammonds's challenge to his sentence under 21 U.S.C. § 841(b)(1)(B). .

### D. *William Darrell Hatch*

Hatch arrived at the Winfield Inn just shortly after Hammonds—his was the second car on the scene. He came with Clarke (who was acquitted at the close of the government's case) in a black Buick. Hatch parked in the Moose Lodge parking lot just south of the Woodfield Inn. After a brief discussion, Clarke got into Hammonds's car, and Hatch walked around the outside of the hotel, and then went into the lobby. He stood at the pay telephones, where he had a view of the parked van containing Burrell, Williams, and Grant. He had a gun in his hand, which he left in a paper bag on the shelf of one of the pay phones when the police moved in to arrest him.

Hatch lived with his sister, who had a relationship with Burrell during October and September 1990. Hatch's sister was pregnant with Burrell's child. She testified that Burrell called her frequently because he was trying to "keep a tab" on her because she was also dating someone else. Trial Transcript (Tr.) at 583. Burrell's sons, who are approximately Hatch's age, also spent time at Hatch's apartment, and Hatch's sister testified that Burrell called the apartment to speak with them. *Id.* at 584–85. Based upon these contacts, Hatch argues that the phone records showing frequent calls to his residence provide no support for the government's contention that Burrell called him to discuss the marijuana sale.

Hatch raises five challenges to his conviction: (1) that there was insufficient evidence to prove the charges in the indictment; (2) that the trial court erred when it allowed the jury to handle the firearms before closing arguments; (3) that the trial court erred in refusing Hammonds's jury

instruction on conspiracy; (4) that there was insufficient evidence to establish that he conspired to possess more than 500 pounds of marijuana, and that, therefore, his sentence was determined improperly; and (5) the court erred by restricting the evidence of Grant's bias.

Hatch's challenges to the trial court's management of the exhibits and its conspiracy instruction have been considered and dismissed above. Hatch adopts the challenges to the restriction of evidence of bias, from defendant Williams's brief. We shall defer discussion of this issue until we reach Williams's other challenges. This leaves his challenge to the sufficiency of the evidence supporting his conviction, and the sufficiency of the evidence underlying his sentence.

### 1. *Sufficiency of Evidence Supporting Conviction*

Again, we consider the evidence presented in the light most favorable to the government, and draw all reasonable inferences in its favor when a defendant challenges the sufficiency of the evidence underlying his conviction. Hatch concedes that Burrell often called his home during the two months prior to the transaction involving Grant. Although he contends that Burrell called to speak with other members of his household, the jury was entitled to believe the government's interpretation of the calls—that Burrell called to talk about the marijuana sale. More significantly, Hatch arrived in Bradley just before Burrell and Williams. He surveyed the motel on foot, and then took up a position in the lobby where he could watch the van. He watched, gun in hand, as Grant, Burrell, and Williams negotiated in the van. He ditched the gun and attempted to flee when the officers moved in. We believe a reasonable jury could infer from these facts that Hatch knew that he was participating in a large-scale narcotics purchase.

There is more evidence of affirmative conduct in this case than in *Zafiro*, 945 F.2d at 888. In that case, the defendant was present when her co-conspirators deliv-

ered a large quantity of cocaine to her apartment, and a suitcase of cocaine was found in her closet. We found that this evidence, coupled with the defendant's failure to provide an alternative explanation of her actions, was sufficient to sustain her conviction. *Id.* Hatch's affirmative actions as bodyguard and look-out provided an even more substantial basis for the jury's finding of guilt on both the conspiracy and attempt counts. We are not persuaded by Hatch's argument that he was merely going along with some suspect activity.

### 2. Sufficiency of the Evidence Supporting Sentence

 Hatch, relying on the argument raised in Williams's Brief, argues there was insufficient evidence to support the trial judge's finding that the offense involved 500 pounds of marijuana. Therefore, he contends, the base offense level assigned under the Sentencing Guidelines (26) was unwarranted. Jones and Williams raise similar claims. The question of the amount of drugs involved in an offense is to be determined by a preponderance of the evidence by the judge at sentencing. As a member of the conspiracy, under the Sentencing Guidelines, Hatch may be sentenced on the basis of the total quantity of drugs the conspiracy can reasonably be estimated to have dealt in. *See Guidelines* § 1B1.3 and comment; *United States v. Townsend,* 924 F.2d 1385 (7th Cir.1991). The responsibility of all three defendants depends upon whether Williams and Burrell, as negotiators for the conspiracy, agreed to purchase 500 pounds of marijuana. Our determination here of the scope of the agreement between Williams, Burrell, and Grant will govern all three defendants' challenge to their sentences.

 According to Williams's version of events, the parties never reached an agreement on the amount of marijuana. Instead, Grant "constantly pushed the defendants to agree to take something that up to that point they had not[.]" Williams Brief at 17. To bolster this argument, Williams points out that he and Burrell did not bring enough money to buy 500 pounds of marijuana. The $60,000 in cash they showed Grant would only purchase 80 pounds of marijuana. *Id.* at 20. Only if the defendants had brought $120,000 (the full purchase price for 500 pounds of marijuana) to Grant, Williams contends, could the judge have found the agreement was for 500 pounds. Based on these lines of reasoning, Williams concludes that the judge erred in finding there was an agreement for 500 pounds. Therefore, his sentence (and the sentences of his co-defendants) should be vacated, and the case remanded for new sentencing.

We find Williams's characterization of the parties' negotiations unpersuasive. He selectively quotes portions of their conversations. When read in context, however, it is clear that Williams and Burrell agreed to purchase 500 pounds of marijuana, but contested the terms of payment. At the September 27, 1990 meeting in Bradley, Grant, Burrell, and Williams settled the amount of marijuana to be purchased:

Grant: All I want to know is, okay. We can cut through the bullshit.

Burrell: Okay.

Grant: What do you want? How much do you want?

Williams: I'll tell you like this. Right now, at this point, we been out of business for about two or three months. It's, the first time, we can move five, but, not five, you know, big five. Five Hundred.

Burrell: Five Hundred.

Williams: We can move five hundred. It might take us a day or two, but listen to me, I guarantee you, after we get rolling and the motherfuckers find out we're back knocking again, we can move at least a thousand.

(unintelligible).

Government's Exhibit 6–1, at 11–12. Later conversations confirmed that Burrell and Williams wanted 500 pounds, but were having trouble raising the cash down payment. *See, e.g., id.* at 15; Government's Exhibit 8–3, at 2. The amount also was reconfirmed at the October 4, 1990 meeting as they counted the cash Burrell and Williams

brought to show Grant. Burrell and Williams agreed that they wanted at least 500 pounds, and possibly the entire 641–pound load that Grant offered. Government's Exhibit 9-1 at 6. The "misunderstanding" Williams refers to in his brief, Williams's Brief at 19, concerned the amount of the downpayment, not the amount of marijuana. This is evident from the surrounding conversation. *See* Government's Exhibit 8-4, at 4-5.

Williams relies upon *United States v. Foley*, 906 F.2d 1261 (8th Cir.1990), in support of his contention that a defendant may not be held responsible for negotiated quantities of cocaine where no agreement to sell is reached. Williams's Brief at 19. Williams's argument is unavailing. He overstates the holding in *Foley*, and more importantly, the facts in *Foley* are readily distinguishable from those in this case. In *Foley*, the defendant was sentenced on the basis of what the government termed an offer to arrange a sale of two ounces of cocaine. *Id.* at 1264. But the court found that the undercover agent brought up the topic of the two ounces, and "not even in the context of another sale. The dialogue between the two demonstrates that neither person was contemplating another sale at that time. The agent simply inquired about the cost of two ounces." *Id.* The court held that the agent's question could not support a finding that a negotiation for another sale took place, and that therefore, the two ounces could not be included in the calculation of the defendant's sentence. The court noted, however, "had the two agreed to another sale of cocaine, any amount under negotiation for such a sale could be used in calculating the BOL [Base Offense Level]." *Id.* at 1265.

In the instant case, the terms of the sale were negotiated and agreed upon. Under *Foley*, the negotiated amount (500 pounds) was properly used to calculate the defendants' sentences. Because we find that Burrell and Williams agreed to purchase 500 pounds of marijuana, we affirm the sentences of all the members of the conspiracy.

## E. John Jones

Jones was a passenger in the Ford Taurus driven by Henry. Henry parked the car in an Amoco gas station about six feet from the car of one of the officers on Grant's stakeout team. As Henry watched the van containing Burrell and Williams, Jones continually looked in all directions. Jones went into the Amoco and returned with some sodas and snack food. He kept an eye on the van as he traveled to and from the Amoco station. After he and Henry were arrested, police found a loaded .38 caliber revolver on the floor under the passenger seat. Jones also had a pocketful of bullets for the gun. Williams's phone records reflected calls to Jones's work phone from August through October 1990.

Jones raises a series of challenges to his conviction and sentence. He argues that (1) his arrest and the subsequent search violated his rights under the Fourth Amendment; (2) that there was insufficient evidence to prove he joined the conspiracy to purchase marijuana; (3) that the judge erred in allowing the jury to handle the firearms, and that the error was not harmless; (4) that the court's conspiracy instruction was confusing, and that the error was not harmless; and (5) that there was insufficient proof that he conspired and attempted to possess 100 kilograms or more of marijuana, and therefore his sentence violates the Fifth and Sixth Amendments and the Sentencing Guidelines. This final challenge is based in part upon an argument that amount should be an element of the crime.

We have considered and dismissed the challenges to the court's management of the exhibits and its conspiracy instruction above. We have also found that the government proved by a preponderance of the evidence that Burrell and Williams agreed to purchase 500 pounds of marijuana, so Jones's challenge to his sentence has been dismissed. Moreover, we have repeatedly held that amount is not an element of the offense defined by Sections 841 and 846. *United States v. Ebbole*, 917 F.2d 1495, 1501 (7th Cir.1990); *United States v. Whitley*, 905 F.2d 163, 165 (7th

Cir.1990). Jones contends, however, that the Constitution and *McMillan v. Pennsylvania*, 477 U.S. 79, 106 S.Ct. 2411, 91 L.Ed.2d 67 (1986), require objective proof that a defendant knew the amount of drugs involved in a conspiracy case. We have recently revisited the question of amount as an element of an § 841 offense, and rejected the position urged by Jones. *See United States v. Trujillo*, 959 F.2d 1377 (7th Cir.1992). We decline to revisit the issue again, and find no merit in Jones's contention that a sentencing judge may rely only upon what Jones terms "objective" evidence when evaluating the amount of drugs involved in a conspiracy case.

This leaves his challenges to his arrest, and the sufficiency of the evidence underlying his conviction. We shall consider each in turn.

### 1. Probable Cause for Search

Jones adopts the arguments of co-defendant Henry in support of his challenge to his arrest and search. Henry and Jones were in the Taurus parked at the Amoco station. They arrived just after Burrell and Williams. Henry drove the car, Jones was the passenger. The car, which bore a Chicago parking sticker, was parked six feet from the car of one of the undercover police officers. The officer watched as Jones and Henry constantly watched the van in the Winfield Inn parking lot and scanned the surrounding area. Jones left the car for a few minutes and purchased some snack food at the Amoco. As he traveled between the station and the Taurus, he kept a constant eye on the van.

Jones argues that his mere physical proximity to a suspected crime was insufficient to support a finding of probable cause. As we have noted, probable cause is a common sense determination made based upon the totality of the circumstances. *Hughes v. Meyer*, 880 F.2d 967, 969 (7th Cir.), *cert. denied*, 495 U.S. 931, 110 S.Ct. 2172, 109 L.Ed.2d 501 (1990); *United States v. Colonia*, 870 F.2d 1319, 1322 (7th Cir.1989). The arresting officer in this case had more information than just Jones's proximity to the van. Again, "[t]he relevant inquiry is not whether specific conduct is innocent or guilty, but the level of suspicion attaching to particular kinds of noncriminal acts." *Colonia*, 870 F.2d at 1323. The officer knew Burrell and Williams were coming from Chicago with bodyguards and that the bodyguards probably would be black. Henry and Jones arrived immediately after Burrell and Williams in a Chicago car, and both men are black. We believe based upon all the facts in the record, taken together, a reasonably prudent person would suspect that Jones was a participant in the drug transaction. *Hughes*, at 969. We conclude that there was probable cause to arrest Jones, and that the court properly refused to suppress the evidence obtained from it.

### 2. Sufficiency of the Evidence

In addition to the facts we have recited above in reviewing Jones's probable cause challenge, evidence admitted at trial showed that Jones had a .38 caliber revolver at his feet in the Taurus. He also carried a pocketful of bullets for the gun. Henry had one of Jones's business cards with him when he was arrested. Telephone records also indicated that Burrell had called the garage where Jones worked three times on the morning before the arrests.

Although not overwhelming, we believe that these facts provide sufficient evidence that Jones knowingly joined the conspiracy to purchase with intent to distribute 500 pounds of marijuana. Jones asserts that even if he knew he was in Bradley to protect Williams's money, that was insufficient to support an inference that he knew that it was a drug deal in the offing. We do not find this contention entirely persuasive. Moreover, as we explained in *Durrive*, 902 F.2d at 1229, we do not view the evidence in a piecemeal fashion. "[I]t is ... imperative that we not rend the fabric of evidence and examine each shred in isolation; rather, the reviewing court 'must use its experience with people and events in weighing the changes that the evidence correctly points to guilty against the possibility of [inaccurate] or ambiguous

inference....'" *Id.* (quoting *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied sub nom., Strong v. United States*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984)).

Jones agreed to join Burrell and Williams's armed entourage, and accompanied them and their $60,000 in cash to a meeting. We submit that a reasonable jury could find that Jones knew the purpose of the meeting and took an active part in ensuring its success. We believe there is sufficient evidence supporting Jones's conviction, and, therefore, we affirm his conviction.

### F. Steven Williams

Williams, with Burrell, was one of the key players in the agreement to purchase the marijuana. In fact, transcripts of their conversations indicate that he may have been the chief partner, and borrowed the cash downpayment. Government Exhibit 6–1, at 13–14, and Exhibit 8–4. Williams met with Grant at the McDonalds in Gilman, Illinois to negotiate the purchase of the marijuana, and had several phone conversations with him prior to the October 4, 1990 meeting in Bradley. Williams told Grant that he and Burrell would not be coming to Bradley alone. Phone records showed Williams contacted several of his co-defendants in the days prior to the meeting in Bradley. Williams rode with Burrell in the van, and participated in the negotiations on October 4, 1990. He carried a loaded .45 caliber pistol and a pager. There was also a 12 gauge pump shotgun in the van. He and Burrell brought $60,000 in cash.

Williams raises three challenges to his conviction and sentence. He argues that (1) the trial court erred in restricting the development of evidence of Grant's bias; (2) that the trial court erred in allowing the jury to handle the defendants' firearms; and (3) that there was insufficient evidence that the total weight of marijuana involved in the offense was 500 pounds, rendering his sentence improper.

The challenge to the firearms has been dismissed. We have also found that Williams and Burrell agreed to purchase 500 pounds of marijuana, and that the district court properly calculated his base offense level of 26. We turn, then, to his remaining challenge.

### The Court's Treatment of Evidence of Grant's Bias

■ Williams and Jones argue that the district judge erred in restricting cross examination of Grant to show Grant's bias. According to Williams and Jones, Grant attempted to influence Burrell's decision to testify on behalf of his co-defendants. Grant was present at Burrell's plea hearing. At that hearing, Burrell stated that his co-defendants did not know about the drug deal, they simply agreed to go with him to Bradley. Burrell also agreed to cooperate with the government, with the hope of receiving a reduced sentence. According to Williams's version of events, Grant contacted Burrell after the plea hearing and warned Burrell that Burrell would mess up his chances if he gave this testimony at his co-defendants' trial.

Grant was one of the government's key witnesses at trial. During cross-examination, counsel for the defendants asked Grant about his contacts with Burrell, and whether he had threatened Burrell. Tr. at 265–69. The court barred these questions because they were outside the scope of the direct examination. *Id.* at 269. The court did instruct the defense that Grant could be called as an adversary witness by one of the defendants as part of their case in chief. *Id.* Williams and Jones contend that barring cross-examination of Grant's contact with Burrell was in error. It was not.

■ A trial judge's evidentiary rulings are not subject to reversal unless there is a clear abuse of discretion. *United States v. Carter*, 910 F.2d 1524, 1530 (7th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1628, 113 L.Ed.2d 724 (1991). Federal Rule of Evidence 611(b) limits cross-examination to the subject matter of the direct examination. Moreover, "because the management of cross-examination is peculiarly committed to the district court's discretion, the

effect is to confine the matter largely to the trial level and to remove it from the area of profitable appellate review." *Id.* at 1530 (citations omitted). Williams and Jones argue that this initial impediment to eliciting evidence of bias was compounded by the district court's other evidentiary rulings. When Hatch presented his case in chief, he called Grant as an adverse witness, but, oddly enough, did not ask him about the alleged contact with Burrell. *Id.* at 564–67. He called Burrell, and Burrell testified that Grant had contacted him after Burrell was subpoenaed. According to Burrell, Grant said, "What do you call yourself doing trying to be Mr. Nice Guy? What are you going to do? All you're going to do is fuck yourself up." *Id.* at 573.

Burrell was then turned over to counsel for Williams. He asked Burrell "as a result of Agent Grant's words to you, did you have a feeling about whether you wanted to testify or not as—" Tr. at 575. The government objected on relevancy grounds, and the court sustained the objection. Williams complains that this ruling also was erroneous. The court was correct— Grant's alleged tampering with Burrell was being presented to show Grant's bias. How Burrell felt about what Grant said is totally irrelevant to Grant's bias.

Next, Jones's attorney asked Burrell if he understood the "context" of Grant's comments. The court interrupted this questioning, and found that it was objectionable. *Id.* at 576. Williams complains about this ruling as well. Although the court did not explain the grounds for this decision, we believe it is clear that if the defense was trying to prove through Grant's comments that he was a biased witness, Burrell's understanding of the "context" of the comments was not relevant.

Finally, Jones's attorney asked Burrell to repeat the statements he made while under oath at his sentencing hearing. Tr. at 593–94. At sentencing, Burrell stated that his co-defendants had not known what was going down in Bradley, they had just agreed to go with him. Counsel for Jones argued

he was trying to get this statement in, not for the truth of the matter asserted, but to show that Grant (who was present at the plea hearing) knew Burrell said it. *Id.* at 595. The government argued that the statement was "rank hearsay," and the court refused to admit it. *Id.* Williams's counsel also argued that it showed that Grant based on his knowledge of Burrell's statement at sentencing, tried to interfere with Burrell's testimony. *Id.* at 597. The court refused to credit this argument:

> Overruled. I mean, I have white hair now, and don't kid me. What you want to do is prof [sic] that prior statement for the truth of the matter in it by this means, and you're not going to get to do it in that way. That is all there is to it.

*Id.*

We do not believe the district judge abused his discretion in his management of this evidence. None of the defendants chose to ask Grant on direct examination about the incident with Burrell. We believe given the ample access to both Burrell and Grant by all the defendants, that they had adequate opportunity to develop their evidence of Grant's bias. Their reliance upon *United States v. Hitchmon*, 609 F.2d 1098 (5th Cir.1979) is misplaced. In that case, two DEA agents failed a DEA-administered polygraph, were subjected to an internal investigation, and a key witness who worked with the agents changed his story two years after the events at issue. *Id.* at 1100. The trial judge refused to allow the defense to cross-examine the witness who changed his story regarding the context of the changed testimony, i.e. the internal DEA investigation. He also refused to allow cross-examination of the agents regarding the investigation. *Id.* 1101.

Here, there were no such stringent restrictions. Instead the trial judge refused to allow cross-examination to exceed the scope of direct, and barred hearsay and irrelevant evidence. Thus, we find Williams's and Jones's challenges to the judge's evidentiary rulings to be without merit.

IV.

For the foregoing reasons, the decisions of the district court are

AFFIRMED.