UNITED STATES of America,
Plaintiff–Appellee,

v.

Rahman NURURDIN, Defendant–
Appellant.

No. 92–2756.

United States Court of Appeals,
Seventh Circuit.

Argued June 8, 1993.

Decided Nov. 3, 1993.

James A. Shapiro, Asst. U.S. Atty. (argued), Crim. Div., Barry R. Elden, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

John M. Beal (argued), Chicago, IL, for defendant-appellant.

Before COFFEY and MANION, Circuit Judges, and ALDISERT, Senior Circuit Judge.*

COFFEY, Circuit Judge.

Rahman Nururdin ("Nururdin") was indicted on one count of being a convicted felon in possession of a handgun in violation of 18 U.S.C. § 922(g). Hung juries resulted in two mistrials before the defendant was convicted following a third jury trial. He was sentenced under the Armed Career Criminal Act, 18 U.S.C. § 924(e), to consecutive terms of 264 months in prison and 5 years probation (supervised release), and ordered to pay a special assessment of $50.00. We affirm.

## I. BACKGROUND

Shortly before midnight on October 9, 1991, uniformed Chicago police officers John Foley and James Eldridge were patrolling in their unmarked police car in an inner-city neighborhood when they heard a gunshot. The officers drove toward the sound of the shot and then stopped. The defendant approached them on his ten-speed bicycle, riding in the opposite direction at a high rate of speed. Officer Foley put his arm out the driver's side window, motioned to Nururdin and said, "Come here." The defendant sped up and rode past them. Foley turned the car around and chased the defendant, who, on a well-lit street and with the squad car's headlights on him, reached into the right front pocket of his jacket and pulled out a stainless steel revolver. Officer Eldridge warned his partner that "he's got a gun," and used the police radio to inform backup officers James Sherlock and Jerome Finnegan that he and Officer Foley were chasing a bicyclist who was armed with a gun.

Both Officers Foley and Eldridge then observed the defendant throw the gun that Eldridge had previously seen him withdraw from his right front jacket pocket. The gun bounced off the hood of a parked car, setting off the car's alarm, and landed on the ground next to a tree. The defendant continued riding until the officers were able to block his path and apprehend him. Backup Officers

* The Honorable Ruggero J. Aldisert, Senior Judge of the Third Circuit, sitting by designation.

Sherlock and Finnegan arrived and detained the defendant while Eldridge and Foley walked back to pick up the gun they had seen him throw. The gun had four live .30 millimeter rounds in it and one spent .30 millimeter round.

Officers Foley and Eldridge returned to their police car and Eldridge gave Nururdin his *Miranda* rights. When Eldridge asked the defendant where he got the gun, the defendant replied, "What gun?" Nururdin was then taken to the police station, where Patrolman Eldridge again gave him his *Miranda* rights. When asked once more about the gun, the defendant told the officers he had just bought it for $80 from a man on the street and was test firing it to see if it worked. About four months later the defendant told agents from the United States Bureau of Alcohol, Tobacco and Firearms ("ATF") that he did not understand why he was being arrested for only having a revolver when there were others in jail with him who had been arrested for having automatic weapons.

The defendant was convicted by a jury of being a felon in possession of a gun. His post-trial motion for a new trial or judgment of acquittal was denied, and he was sentenced on July 10, 1992, under the Armed Career Criminal Act.

## II. ISSUES

The defendant raises five issues. He argues that he was denied his constitutional right to an impartial jury and that the district court abused its discretion in denying his challenges for cause during *voir dire*. He also challenges the trial court's decision to permit the government to cross-examine him regarding his four prior felony convictions, and he argues that there was insufficient evidence to convict him of possessing a gun. Finally, he contends that the trial court

1. Nururdin does not allege a violation of his Sixth Amendment right to a jury selected from a fair cross-section of the community, conceding that "defendant does not have sufficient information about the racial percentages of the entire jury pool or about Northern District of Illinois demographics to effectively mount a fair cross section challenge."

erred in sentencing him pursuant to the Armed Career Criminal Act.

## III. DISCUSSION

### A. Impartial Jury

The defendant, who is black and resides in the inner-city neighborhood in which he was arrested, contends that the trial court erred in denying his motion for a new trial or judgment of acquittal on the grounds that the racial makeup of his jury violated his Fifth and Sixth Amendment right to an impartial jury.[1] The jury venire included two blacks, but although neither was struck, neither was selected to sit on the trial jury. Thus the petit jurors were all white and, with the exception of one Chicago resident, lived in the suburbs.

The defendant contends that because a black person's life is profoundly different than that of a white person who lives in either Chicago or the suburbs, the jury in his case "did not, and could not have acted as an impartial trier of the facts of this case."

Although the defendant stresses the suburban residency of the majority of the jurors in his case, he ultimately bases his constitutional claim on their race:

"... [I]t is defendant's position that jurors could not be impartial in this case who did not have some understanding of the nature of the relationship between white Chicago police officers and black citizens, generally, in Chicago, and the nature of life and behavior in the black inner city. Virtually all blacks in Chicago understand those issues, and most whites in Chicago, not to mention the suburbs, do not because they have no experience with them."

The defendant cites no case law in support of this proposition, but quotes sociologists and newspaper articles in an effort to demonstrate that "recognized social realities"[2] leave white jurors incapable of fairly assess-

2. In his reply brief, the defendant includes affidavits from two black Chicagoans to the effect that white police officers routinely harass innocent black residents.

ing the credibility of white police officers who arrest and testify against inner city blacks.

The defendant's contention, therefore, is that an all-white jury is incapable of acting impartially in this case because of their lack of understanding of inner-city life and its problems. This argument is untenable in light of the Supreme Court's explicit rulings to the contrary. As we have explained before:

> "The Supreme Court has made clear ... that the sixth amendment does not provide the criminal defendant with the right to a petit jury of any particular composition. *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).... We are confident that all jurors, black, white, or any other race, creed or color, upon the taking of their oath are equally capable of performing their task impartially."

*Teague v. Lane,* 820 F.2d 832, 843 (7th Cir. 1987), *aff'd,* 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989).

Any lingering doubts on the matter should have been put to rest by *Edmonson v. Leesville Concrete Co.,* —— U.S. ——, 111 S.Ct. 2077, 114 L.Ed.2d 660 (1991), in which the Supreme Court bluntly stated:

> "If race stereotypes are the price for acceptance of a jury panel as fair, the price is too high to meet the standard of the Constitution. Other means exist for litigants to satisfy themselves of a jury's impartiality without using skin color as a test. If our society is to continue to progress as a multiracial democracy, it must recognize that the automatic invocation of race stereotypes retards that progress and causes continued hurt and injury."

*Id.* at ——, 111 S.Ct. at 2088.

Finally, we note that just last term, in *Georgia v. McCollum,* —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992), the Court reemphasized that it "firmly has *rejected* the view that assumptions of partiality based on race provide a legitimate basis for disqualifying a person as an impartial juror." *Id.* at ——, 112 S.Ct. at 2359 (emphasis added).

Accordingly, we hold that the trial court did not err in refusing to find that the jury's racial composition necessarily prevented it from performing its duties in an impartial manner.

## B. Challenges for Cause

The defendant next mentions but fails to support his argument that the trial court erred in denying his challenges for cause during *voir dire.* We have previously held that to preserve his claim, an appellant must provide this court with more than a one-page assertion unsupported by any authority. *John v. Barron,* 897 F.2d 1387, 1393 (7th Cir.1990), *cert. denied,* 498 U.S. 821, 111 S.Ct. 69, 112 L.Ed.2d 43 (1990). *See also United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991); *United States v. Mason,* 974 F.2d 897, 901 (7th Cir.1992). Nevertheless, given the importance of the issue raised and out of an abundance of caution, we will address his argument despite the very real possibility of waiver.

At issue is the trial court's refusal to dismiss four potential jurors who had a connection to law enforcement: two of the venire members were related to law enforcement officers, a third was an Illinois prison employee, and a fourth was an FBI agent who had once met one of the assistant U.S. Attorneys who prosecuted this case.

The defendant states that because he believed these four jurors could not impartially gauge the credibility of the Chicago police officers who were to testify against him, he was forced to use four of his peremptory strikes to remove them. This in turn prevented him from using his peremptory strikes to try to "secure" on the jury either of the two black venire members.

In reviewing denials of challenges for cause, we "accord great deference to the judgment of the experienced trial judge based on his unique opportunity to assess the credibility of the jurors during *voir dire* examination, as well as their demeanor throughout the course of the trial." *United States v. Barnes,* 909 F.2d 1059, 1070–71 (7th Cir.1990).

We think a trial judge has discretion to find that a juror's mere relationship to a law enforcement officer is insufficient to strike for cause. *See Brogdon v. Butler,* 838

F.2d 776, 778 n. 1 (5th Cir.1988) (trial court did not abuse its discretion in refusing to excuse for cause a prospective juror who was married to a law enforcement officer and whose uncle by marriage was an investigator for the District Attorney's Office). Nor will we mandate that the mere fact that a potential juror is a prison employee or an FBI agent requires that the trial judge strike for cause. We agree with the Second Circuit that a trial court "is not required to excuse any juror on the basis of his occupational background so long as the court is able to conclude that the juror would be able to view the evidence with impartiality and to decide the case without bias." *United States v. Maldonado–Rivera*, 922 F.2d 934, 970–71 (2nd Cir.1990). In this regard, we think it significant that the trial judge observed the challenged jurors swear under oath that they could be impartial, for

> "Absent any reason to suspect that these responses were untrue, we must credit them; 'surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter.'"

*United States v. York*, 933 F.2d 1343, 1367 (7th Cir.1991) (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)), *cert. denied*, —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262 (1991).

■ In this case, the record contains no evidence to suggest that any of the four venire members would have violated their oath had they been seated. But even assuming that the trial court should have stricken one or more of them for cause, the Supreme Court has determined that "[s]o long as the jury that sits is impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the Sixth Amendment was violated." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 2278, 101 L.Ed.2d 80 (1988) (citing *Hopt v. Utah*, 120 U.S. 430, 436, 7 S.Ct. 614, 617, 30 L.Ed. 708 (1887); *Spies v. Illinois*, 123 U.S. 131, 8 S.Ct. 22, 31 L.Ed. 80 (1887)).

Like Nururdin in the case before us, the defendant in *Ross* had claimed that the composition of his all-white jury denied him a fair and impartial trial by his peers. In support of this claim, he argued that he had to use one of his peremptory strikes to remove a juror the trial court had erroneously refused to remove for cause. The Supreme Court held that the trial court did indeed err in not striking the juror for cause, but that, by itself, this error was not grounds for reversal:

> "Petitioner was undoubtedly required to exercise a peremptory challenge to cure the trial court's error [in failing to grant the defendant's challenge for cause]. But we reject the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury. We have long recognized that peremptory challenges are not of constitutional dimension. [Citations omitted.] They are a means to achieve the end of an impartial jury."

*Ross*, 487 U.S. at 88, 108 S.Ct. at 2278.

Similarly, the record discloses that none of the 12 jurors who decided Nururdin's fate was challenged for cause by defense counsel. Nor is there evidence in the record that might lead one to suspect that any member of the petit jury failed to act impartially. We hold, therefore, that the trial court's refusal to strike the four jurors for cause was not reversible error where the challenged jurors were all removed by peremptory strikes and the jury that actually sat was impartial.

### C. Admission of Prior Convictions

In another summary argument, the defendant contends that the trial court abused its discretion in permitting the prosecution to cross-examine him about his four prior felony convictions for robbery, attempted robbery, and aggravated battery. The record reveals that the district court admitted these prior felonies pursuant to Federal Rule of Evidence 609(a)(1), which provides that, for the purpose of attacking a defendant's credibility, evidence that an accused has been convicted of a felony "shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."

■ In *United States v. Mahone*, 537 F.2d 922 (7th Cir.1976), this court set out a five-

part test for determining when the probative value of a prior conviction outweighs its prejudicial effect:

(1) The impeachment value of the prior crime.

(2) The point in time of the conviction and the witness's subsequent history.

(3) The similarity between the past crime and the charged crime.

(4) The importance of the defendant's testimony.

(5) The centrality of the credibility issue.

*Id.* at 929.

The defendant claims that, according to *Altobello v. Borden Confectionary Products Inc.*, 872 F.2d 215 (7th Cir.1989), his prior convictions were not for crimes of "inherent dishonesty" and that therefore the first of the *Mahone* factors listed above militated against admitting his prior convictions into evidence.

■ This "argument" falls far short of demonstrating that the trial court abused its discretion. Initially, *Altobello* concerned the admissibility of the *misdemeanor* offense of meter tampering under Fed.R.Evid. 609(a)(2), the provision that permits the introduction of a witness's prior crimes (whether felonies or misdemeanors) that "involved dishonesty or false statement regardless of the punishment." In contrast, Nururdin's prior crimes were admitted under Fed.R.Evid. 609(a)(1), which permits the admission of prior *felony* convictions provided the court "determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant." Thus a prior felony need not have involved "inherent dishonesty" to be probative and admissible under Fed.R.Evid. 609(a)(1).

■ In addition, the district court made clear in its opinion that it was not relying on the first *Mahone* factor. The trial court explicitly relied on the fourth and fifth factors: the importance of the defendant's testimony, and the centrality of the credibility issue. As the court explained, "the defendant's testimony and the credibility issue are both critical to the outcome of this case because defendant and the officers offered conflicting accounts of the events leading to defendant's arrest." *United States v. Nururdin*, 794 F.Supp. 277, 281 (N.D.Ill.1992).

In addition, the record demonstrates that any prejudicial effect that the introduction of the prior felony convictions could have had was overcome by the court's limiting jury instruction, which directed that this evidence could not be used to demonstrate a propensity to commit crime, but could only be used to impeach the defendant's testimony.

We agree with the district court that, in light of the critical nature of Nururdin's testimony and credibility, the government's impeachment evidence was highly probative. We further agree that the court's proper use of a limiting instruction curtailed the possibility that this evidence could have a prejudicial effect. Thus we hold that the district court did not abuse its discretion in finding that the probative value of the defendant's prior felony convictions outweighed their prejudicial effect and that this evidence was therefore admissible under Fed.R.Evid. 609(a)(1).

### D. Sufficiency of the Evidence

■ The defendant contends that the evidence was insufficient to convict him of having possessed a gun. A defendant urging that his conviction be overturned because it was not supported by sufficient evidence "carries a heavy burden." *United States v. Campbell*, 985 F.2d 341, 344 (7th Cir.1993) (citing *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.1992). It is well settled that "[w]e review the evidence in the light most favorable to the government, and if we determine that a rational jury could have found the defendant guilty, we will affirm the conviction." *Id.* (citing *Burrell*, 963 F.2d at 987).

Nururdin argues that the testimony of the police officers regarding how they observed him throwing a gun to the ground was so implausible and unworthy of belief that no reasonable person could have failed to have had a reasonable doubt as to his guilt of possessing a gun. Nururdin notes that the officers testified that when he rode past them on his bicycle, it took them seven to nine seconds to turn their car around and drive the fifty to seventy-five feet to the intersec-

tion of 67th Street and Blackstone, where, they testified, they caught up with him and observed him pull a gun from his right front jacket pocket. Then, according to the officers, in an attempt to get rid of it, he threw the gun and it landed on the hood of a parked car where it bounced to the ground. Pointing to his own testimony that it took him only one to two seconds to travel that same distance on his bicycle, Nururdin claims that Officers Foley and Eldridge described a time sequence that is physically impossible.

The defendant also contends that the testimony of Officer Sherlock (one of the backup officers who arrived to assist in the arrest) was unworthy of belief. Nururdin notes that Sherlock testified at trial that he had never discussed this case with Officers Foley or Eldridge despite the fact that he worked with them every day after the defendant's arrest. Contending that this testimony "strains credulity," Nururdin reasons that Sherlock's entire testimony corroborating the testimony of his fellow officers must also be called into question.

Finally the defendant argues that, based on their knowledge of police behavior in the inner city, the black jurors in his first two trials disbelieved the testimony of the white police officers, while the all-white jury in the third trial "did not have a clue." In Nururdin's view, instead of accepting the police officers' testimony regarding their eyewitness account of his gun possession, any reasonable juror would have believed the following testimony that he offered the jury.

According to the defendant, on the night of his arrest he did not stop when Officer Foley told him to because the area in which he was riding was dangerous (Nururdin claimed there had recently been a drive-by shooting in the area), and because he did not know that Foley was a police officer. Nururdin testified that although both Foley and Eldridge were in uniform, he never looked into the unmarked police car to see who was calling him. The defendant's explanation of how he set off a car alarm was that he lost

control of his bike while turning a corner, careened into a car parked at the corner, "kicked off" that car, bounced across the street into another parked car, and while pushing off from the second car inadvertently set off its alarm system.[3] He denied ever possessing a gun, and claimed that the pockets in the Starter brand jacket he was wearing at the time of his arrest were so small that he could not have carried a gun in them in any event. He claimed that this jacket, which he described as a Starter brand jacket without any team logo on it, was lost or stolen after he turned it in at Cook County jail.

We are convinced, as was the jury, that the officers' testimony concerning how long it took them to turn their squad car around and pursue the defendant was plausible and believable. Whether or not this maneuver actually took seven to nine seconds, as the officers estimated, we agree with the district court, which ruled that "a discrepancy of a few seconds, when the officers were concentrating on the pursuit of defendant and not a stop watch, does not render the officers' testimony incredible." *Nururdin,* 794 F.Supp. at 282. The defendant offered a different estimate of the times involved, but we doubt he was consulting a stop watch either.

The government, on the other hand, offered substantial rebuttal evidence that the defendant's testimony was less than truthful. Nururdin had testified that one of the reasons he didn't stop when the officers directed him to was that there had recently been a drive-by shooting in the area. But, again, the jury failed to believe him, probably based on the testimony of another police officer who testified from official police records that no such drive-by shooting in this area had been reported to the police of recent date.

The government also produced several witnesses to rebut Nururdin's testimony regarding his missing Starter jacket with the allegedly small pockets. A police officer was called to testify that there was no record of any complaint having ever been made about the defendant having lost a jacket at the

---

3. The record is silent as to whether either party examined the parked cars for physical evidence of these claimed multiple collisions.

Cook County jail. The manager of the store where the defendant testified he allegedly purchased the Starter jacket was also called to testify and stated that, contrary to Nururdin's testimony, the store had never sold a Starter jacket without a sports team logo. Finally, the government presented the rebuttal testimony of Burton Bradley, the executive in charge of manufacturing for the company that makes Starter brand jackets. Mr. Bradley testified that the smallest pocket Starter manufactures is six inches wide and six inches deep. He brought with him a Starter jacket with the smallest pocket his company makes, and the government demonstrated that, contrary to the defendant's testimony, the gun which they had retrieved at the scene easily fit into the jacket pocket.

We refuse to second-guess the jury's decision in this case to believe the police officers' corroborated testimony over that of the defendant. As an appellate court, we "will not reweigh the evidence or judge the credibility of witnesses when reviewing the sufficiency of the evidence." *United States v. Reed*, 2 F.3d 1441, 1444 (7th Cir.1993) (citing *United States v. Maholias*, 985 F.2d 869, 874 (7th Cir.1993)). As the trier of fact, it was the jury which had

> "the best 'opportunity to observe the verbal and non-verbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record."

*United States v. Duarte*, 1 F.3d 644, 651 (7th Cir.1993). *See also United States v. Seavoy*, 995 F.2d 1414, 1421 (7th Cir.1993); *United States v. Tolson*, 988 F.2d 1494, 1497 (7th Cir.1993); *Churchill v. Waters*, 977 F.2d 1114, 1124 (7th Cir.1992).

After reviewing the record, we are convinced that the testimony of the government's rebuttal witnesses not only corroborated the testimony of the arresting officers, but provided overwhelming evidence that the defendant's version of events was less than plausible, much less truthful. We hold, therefore, that the evidence was more than sufficient to permit a rational juror to find the defendant guilty of having been a felon in possession of a gun.

### E. Sentencing

Finally, the defendant argues that the district court erred in sentencing him as an Armed Career Criminal. Under the Armed Career Criminal Act, 18 U.S.C. § 924(e), a defendant is subject to an enhanced sentence if he is convicted of being a felon in possession of a gun in violation of 18 U.S.C. § 922(g) and has three previous convictions for a violent felony or serious drug offense. At his sentencing hearing, Nururdin claimed that his guilty pleas to two of his prior felonies (a 1987 conviction for aggravated battery, and a 1985 conviction for attempted robbery) were obtained in an unconstitutional manner and therefore should not be used to enhance his sentence under the Armed Career Criminal Act. Conceding that he was unable to find any cases to support his theory, he nevertheless argued that two of his guilty pleas were "involuntary and unknowing" because he was not advised at the time that the convictions could expose him to the possibility of sentencing enhancement in the future.

In rejecting this argument, the sentencing judge explained that:

> "This Court knows of no law that would substantiate that [defense theory]. I'm very familiar with [the Armed Career Criminal Enhancement Act]. It's one that obviously has major impact on defendants' lives, and is heavily briefed and argued as it is today, using every aspect that any attorney can possibly come up with and, rightfully so, because it should be.
>
> "It's a very, very harsh, severe kind of penalty, designed for that reason, and I know of no law that would ... allow me to do what the defendant is asking me to do, nor does the Court believe that the logic of the matter would also dictate imposing that kind of restriction upon this particular armed career criminal provision."

The trial court's finding is in accord with the Supreme Court, which recently noted that:

"Under the Armed Career Criminal Act, 18 U.S.C. § 924(e), Courts of Appeals have placed on the defendant the entire burden of proving the invalidity of a prior conviction based on a guilty plea. *See, e.g., United States v. Gallman,* 907 F.2d 639, 643–645 (CA7 1990), *cert. denied,* 499 U.S. 908, 111 S.Ct. 1110, 113 L.Ed.2d 219 (1991); *accord United States v. Paleo,* 967 F.2d 7, 13 (CA1 1992); *United States v. Day,* 949 F.2d 973, 982–983 (CA8 1991); *United States v. Ruo,* 943 F.2d 1274, 1276 (CA11 1991)."

*Parke v. Raley,* —— U.S. ——, ——, 113 S.Ct. 517, 525, 121 L.Ed.2d 391 (1992).

Yet, as a review of the record makes clear, the defendant has not even tried to meet this burden. Instead, without citing any authority whatsoever for his position, he simply reasserts on appeal that:

"If [Nururdin] had known that by pleading guilty he was exposing himself to the possibility of the sentence provided by the armed career criminal enhancement, he never would have pled guilty in either case. Thus, the imposition of the armed career criminal enhancement in this case renders involuntary and unknowing the pleas of guilty in the two foregoing cases. Consequently, they are constitutionally inadequate and should not have been relied upon to impose the armed career criminal enhancement."

Under the defendant's novel theory, the judge who accepted his guilty plea to attempted robbery in 1985 should have warned him that the resulting conviction could expose him to a future sentencing enhancement in the event he 1) went on to accumulate at least two more violent felony or serious drug convictions, *and* 2) subsequently managed to be convicted of being a felon in possession of a gun.

We refuse to place such an absurd burden on the trial courts. We think the judges presiding over Nururdin's previous (2) guilty pleas were entitled to hope that the resulting prison sentences and terms of probation might deter him from jet propelling himself down the path toward Armed Career Criminal status. There is no basis either in law or in logic for holding that the Constitution required these judges not only to anticipate that the defendant would continue to lead a life of crime, but also to counsel him accordingly.

A guilty plea is knowing and voluntary if the defendant was first made aware of the *direct consequences* of his plea. *See Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 1472, 25 L.Ed.2d 747 (1970) (citations omitted). This court has held that the possibility of federal prosecution under the Armed Career Criminal Act is *not* a "direct consequence" of a guilty plea within the meaning of *Brady. United States v. Jordan,* 870 F.2d 1310, 1317 (7th Cir.1989), *cert. denied,* 493 U.S. 831, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989). We hold, therefore, that there is no merit to the defendant's claim that his guilty pleas were involuntary and unknowing merely because he was not informed about the possibility of a future federal prosecution under the Armed Career Criminal Act.

## IV. CONCLUSION

Conviction and sentence

AFFIRMED.