**Michael LANGE, Plaintiff–Appellee,**

v.

**UNITED STATES of America, Defendant–Appellant.**

No. 93–2564.

United States Court of Appeals, Seventh Circuit.

Argued April 19, 1994.

Decided Aug. 3, 1994.

Philip H. Corboy (argued), Corboy & Demetrio, Chicago, IL, for plaintiff-appellee.

Nancy K. Needles, Asst. U.S. Atty., Office of U.S. Atty., Civ. Div., Appellate Section, Linda A. Wawzenski, Asst. U.S. Atty. (argued), Office of U.S. Atty., Chicago, IL, for defendant-appellant.

Before COFFEY, FLAUM, and EASTERBROOK, Circuit Judges.

COFFEY, Circuit Judge.

Plaintiff-appellee Michael Lange, while driving his motorcycle, collided with a United States Postal semi-tractor trailer driven by Harold Baker. Lange sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 1346 et seq., arguing that the driver of the postal truck was negligent as to a number of rules of the road, including but not limited to failure to keep a proper lookout, violation of a traffic control signal, and maintaining a speed greater than reasonable at a controlled intersection, among others. The district court, following a bench trial, found the Postal Service driver was sixty percent negligent and Lange forty percent negligent. After reducing Lange's total damages of $484,327 by the amount of negligence attributed to him (40 percent), the court entered judgment "in favor of plaintiff, Michael Lange, and against defendant, United States of America, in the amount of $289,997." The United States appeals, arguing that the evidence established that Lange, in an attempt to commit suicide, deliberately drove his motorcycle into the postal truck, and thus the court's apportionment of negligence was erroneous. We affirm.

*FACTS*

According to the undisputed trial testimony, the collision occurred on July 13, 1988, at about 10:40 p.m., at the intersection of Roosevelt Road and Laramie Avenue in Chicago, Illinois. Roosevelt Road is a six-lane roadway with two eastbound lanes, two westbound lanes, and two left-turn-only lanes for eastbound cars turning north and westbound cars turning south. Laramie Avenue is a four lane road running north-south. The posted speed limit on Roosevelt Road was thirty miles per hour while the speed limit on Laramie is not reflected in the record. The accident occurred when Lange, riding his motorcycle westbound on Roosevelt, collided with a postal truck, which was travelling eastbound on Roosevelt and was in the process of turning north onto Laramie.

An eyewitness, Steve Bogdan, testified that he was travelling south on Laramie Avenue and had stopped his car at the Roosevelt intersection for a red light. Bogdan stated that he observed the postal truck approach the intersection going east on Roosevelt; upon reaching the intersection, the truck began to turn left to go north on Laramie at a speed "around three miles an hour, maybe five, slowing down to make a turn." Bogdan also observed that as the truck began its left-hand turn, a motorcycle was approaching the intersection from the opposite direction (west on Roosevelt) at a speed of "between twenty-five and thirty miles an hour." The witness testified that as "[t]he truck started turning north onto Laramie, ... it appeared to me that the motorcycle drove head-on into it." Bogdan did not hear "any brakes screeching from the motorcycle" and stated that the two vehicles collided, and the operator of the motorcycle "went flying backwards after he hit the truck ... and was separated from the motorcycle." According to Bogdan, at the time the truck "first started its turn," the motorcycle was "thirty or forty feet from where the accident occurred[,]" and at the time of impact, the truck was moving "very slowly." After the accident, the witness Bogdan exited his vehicle and rendered assistance.

Another witness, Louise Pavon, testified that as she approached the intersection from the south and was stopped for the light she "heard a loud squeaking, like an impact, and I seen the truck trying to stop and the kid flying in the air." However, Pavon stated that she "d[id]n't know for sure" whether the noise she heard came from the truck or the motorcycle.

Willie Hall, a pedestrian who was standing near the northeast corner of the intersection, was also present at the time of the accident. Hall testified that he initially observed the postal truck begin its left-hand turn onto Laramie and "heard the motorcycle coming" from the east. According to Hall, the motorcycle was "just west of the next corner from Laramie" at the time the post office vehicle began to turn, and was travelling "[a]bout fifty-fifty-five [miles per hour], something like that." The light for Roosevelt traffic

was green at the time of the impact. Hall testified that he did not see the motorcyclist attempt to swerve or stop, and that "[t]he guy braced hisself [sic] just before he hit it." Hall stated that the truck was moving at the time of the collision.

The driver of the motorcycle, Michael Lange, testified that he was unable to recall any of the events surrounding the accident. The loss of memory was undoubtedly caused by the serious head injury. Baker, the postal truck driver, had been deposed sometime prior to trial, and according to the record, the government's attempts to locate him at the time of the trial were futile. Thus, Baker's deposition testimony was offered and received in evidence. According to Baker's deposition testimony, "[t]he light was green until I entered the intersection and then, you know, the light turned yellow.... I started to make my turn when the yellow light came on, I decided to make my turn and I never completed the turn ... [b]ecause I heard a loud noise and then I saw the headlight and I knew it was a motorcycle and I stopped." Baker stated that when he first saw the motorcycle, it was "more than a block" east of him and that by the time he (Baker) reached the intersection, Lange was "about a block" away, travelling behind two cars. By the time the motorcycle had closed the distance "to about half a block[,]" it "seemed" to Baker that Lange "lost control of his bike because he was—his wheel was locked, screaming noise like burning rubber and his, you know, the headlight on the motorcycle was veering left, right, left, right." Baker's description of the locked wheels, burning rubber, and veering headlights strongly suggests that Lange had forcefully applied his brakes in an attempt to avoid the accident. Finally, Baker asserted that his truck was stopped at the time of the collision and that the light for eastbound Roosevelt Road had turned from yellow to red. To say the least as in most accidents, it is apparent that there were a number of inconsistencies in the respective witnesses' recollection of the event.

The injured Lange was transported to Foster G. McGraw Hospital at Loyola University and was described upon admission as being in a coma, having suffered a "traumatic brain injury," "[a]n open left tibia fracture as well as a displaced right distal radius fracture" of the wrist, and a "subarachnoid bleed." The trauma to Lange's cranial cavity was so severe that it necessitated a craniotomy and the surgical insertion of a "subarachnoid bolt" in his skull to "monitor pressure within [Lange's] head." Dr. Richard Bonfiglio testified that as a precaution, the coma initially was "maintain[ed]" by the use of medications "to decrease brain function ... so that there would be less injury done[.]" (Bonfiglio further stated that Lange was "weaned ... fairly quickly" from the medications which maintained the coma.)[1] Lange's attending orthopedic physician, Dr. Kenneth Schiffman, testified that on the day following the accident, July 14, 1988, he "brought [Lange] to surgery ... for a sequential or secondary debrisement, that is, cleaning of the wounds and the bone ends and then applying an external fixator, which is a device to stabilize fractures." Four days later, on July 18th, Lange underwent surgery to graft pieces of bone from his pelvis to his tibia and to address the injuries to his right wrist.

On July 19, 1988, at approximately 10 p.m., Lange stated in the presence of one Nurse Canfield that "I want to die. I want to end it all. I tried to end it by running into the truck. I want to die" (the "alleged suicide statement"). Nurse Canfield in her nursing notes referred to the statement. As a result of the remark, the hospital followed its standard precautionary measures placing the patient on a suicide watch and thereafter ordering a psychiatric test by Dr. Deborah Couch. According to Lange's "discharge summary," Dr. Couch described Lange's condition as

---

1. Bonfiglio testified that "it is not like the television shows where people go from being in a coma to immediately being lucid, answering questions and things. Individuals slowly come out of a coma. The rate at which people come out varies, obviously, from person to person, but they tend initially to have episodes or periods of agitation and then other periods of sleepiness, also be intermittently confused and then seem somewhat more lucid[.] So, [Lange] continued to have that sort of watching and weaning then over, at least, the next week to ten days after the injury."

reflecting a "character disorder rather than actual suicidal intentions." At trial, Dr. Bonfiglio agreed that the statement Lange made in Nurse Canfield's presence was probably false, noting that "most individuals who have [a] brain injury like this with a period of coma tend not to be a very good historian at the time that they are coming out of coma. They tend to become—they tend to be confused and disoriented[.]" Dr. Bonfiglio observed that Nurse Canfield's notes for July 19, 1988 (the day the alleged suicide statement was made) also stated, "P[atien]t in and out of orientation[,]" indicating to Dr. Bonfiglio that "on the nineteenth, [Lange] was still having significant cognitive problems."

Dr. Bonfiglio testified that in addition to Lange's brain injury and resulting amnesia, the medications and/or drugs may have influenced Lange's behavior and contributed to the unreliability of the statement. Bonfiglio testified that in the "week to ten days after [the] injury," Lange "was on a number of medications, including some that can affect the thought processes, . . . including pain medication, Morphine, Demerol, Visteril, and Codeine." Lange's hospital records indicate that on July 19, Lange's physicians had ordered "Valium Diazepam," "Tylenol Acetaminophen," "Tylenol # 3," "Visteril Hydroxyzine," "Demerol Meperidine," and "Haldol Haloperidol"; all except Valium Diazepam were ordered on an "as needed" basis. The records also indicate that on July 19, Lange actually received Demerol, Haldol, and Valium.

There was other evidence presented at trial that Lange's alleged suicide statement was unreliable. Dr. Bonfiglio noted that during Lange's psychiatric examination with Dr. Couch, Lange was probably confused and disoriented as evidenced by his statement to Dr. Couch that he worked as a psychotherapist. (In fact, at the time of the accident, Lange was the manager of Chicago Studio Rentals, which rents "lighting equipment and space, stages and trucks for motion picture filming"; Lange, according to the record before us, had never been employed as a psychotherapist.) Kay Lange, the plaintiff's mother, testified that during her son's hospital stay, Lange exhibited "strange behavior":

he tried to eat toy plastic raisins, he requested that his best friend leave the room while allowing his friend's mother to remain, and he kissed another friend's hand and told that person that he loved him. Kay Lange asserted that prior to the accident she had never observed "any depressive personality traits in [her] son[,]" and that he was a "happy" person, with a job he liked and "three girlfriends at the time." Likewise, Lange's father Joseph testified that prior to the accident, his son "was full of vim and vigor. He was enjoying life to its fullest. He had little or no cares. He had a car, a motorcycle. He had a job and was making good money. He had girlfriends, and all that." Joseph Lange further stated that "[w]hen [Michael] came out of the coma, he was very incoherent. He didn't know what had happened" and that throughout his three week stay at Loyola, the conversations he had with his son "certainly weren't lucid." Lange himself confirmed his parents' observations, testifying that "I was twenty-one. I had the world by the balls—excuse my language—and I was very, very happy with what I was doing. I enjoyed my job tremendously. I was making quite a deal of money for my age and position. . . . I had several girlfriends. I was not hurting in any way." In addition, Lange stated that prior to the accident, he had never "in any way, shape or form . . . receiv[ed] any psychiatric or psychological counseling treatment . . . or any anti-depressant medication."

Finally, Dr. Bonfiglio testified that "despite [Lange's] tremendous efforts, and all the medical rehabilitative services, . . . he is still left with a residual from the brain injury despite, you know, everything, the damage done and he will not fully recover." Specifically, Lange suffers from "residual problems . . . with impaired memory, problemsolving, [and] irritability" which Dr. Bonfiglio does "not expect" to improve in the future. In addition, Dr. Schiffman testified that there was a greater than fifty percent chance that Lange would suffer pain as a result of his physical injuries for the rest of his life.

The district judge found that "Lange's speed was excessive insofar as he was approaching a large intersection on a motorcy-

cle where there was a semi-tractor trailer approaching from the opposite direction intending to turn left. This failure to slow or take other evasive action constitutes contributory negligence which was a proximate cause of the accident." In addition, the court found that "Lange's failure to slow his motorcycle or take other evasive action to avoid hitting the truck makes it obvious that Lange did not see the truck making the turn. Failure to see under these facts proves that Lange failed to keep a proper lookout, which also constitutes contributory negligence which was a cause of the accident." The trial judge further stated that "[t]he court finds by a preponderance of the evidence that Lange did not try to commit suicide in the accident." However, the court determined that Baker's negligence was greater than Lange's stating: "Baker did not keep a proper lookout for oncoming traffic prior to making his turn, which caused him to fail to yield the right-of-way to Lange, who at the time Baker began his turn was so close to the intersection as to constitute an immediate hazard. This failure on the part of Baker to keep a proper lookout was a proximate cause of the collision with Lange." The court apportioned each party's negligence as follows:

> Bearing in mind that Lange had the right to be allowed to proceed through the intersection prior to Baker making his turn, even though Lange could and should have slowed his motorcycle and kept a lookout rather than assume that Baker would see him and yield the right of way, the court finds that the fault of Baker and, vicariously, the Postal Service, is greater than the fault of Lange. The court finds that the fault of the Postal Service constituted 60 percent of the cause of the accident, and the contributory fault of Lange constituted 40 percent of the cause of the accident.

In line with the apportionment of negligence, the court reduced Lange's total damages of $484,327 by forty percent and entered judgment in favor of Lange in the amount of $289,997.

## ISSUES

The government limits its appeal to two issues: 1) whether the court's finding that Lange did not attempt to commit suicide by driving into the truck constitutes clear error; and 2) whether the court's determination that Lange was responsible for only forty percent of the total fault was proper.

## DISCUSSION

### I.

#### Standard of Review

"Fed.R.Civ.P. 52(a) directs that a district court's finding of fact 'shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.'" *Ambrosino v. Rodman & Renshaw, Inc.*, 972 F.2d 776, 784 (7th Cir.1992). "A finding is clearly erroneous when, although there may be some evidence to support it, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed'." *Savic v. United States*, 918 F.2d 696, 700 (7th Cir. 1990) (citing *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)), *cert. denied*, —— U.S. ——, 112 S.Ct. 62, 116 L.Ed.2d 38 (1991). " 'We may have such a conviction if the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence.' " *Id.* (quoting *E.E.O.C. v. Sears Roebuck & Co.*, 839 F.2d 302, 309 (7th Cir. 1988)). "Thus, where 'the district court's account of the evidence is plausible in light of the record viewed in its entirety,' the reviewing court may not reverse merely because it would have 'weighed the evidence differently.' " *Ambrosino*, 972 F.2d at 784 (quoting *City of Bessemer City*, 470 U.S. at 574, 105 S.Ct. at 1511). "Likewise, 'where there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous.' " *Id.*

■ The government contends that there was ample evidence from which the court could have concluded that Lange attempted to commit suicide by colliding with the postal truck. For example, the government argues that Bogdan testified that it appeared to him that the motorcycle drove head-on into the postal vehicle, and that Hall stated that

Lange did not attempt to swerve and instead "braced hisself just before he hit [the truck]." The government attempts to make the point that "Lange never directly denied that he had suicide intent that night, nor did he deny making the statement on July 19 to the nurse at the hospital." (However, we note that when Lange was questioned on direct examination whether he deliberately drove into the truck, the government objected in an attempt to exclude any response from the plaintiff Lange.) In any event, Lange made it very clear that he was neither depressed nor despondent immediately prior to the accident, testifying concerning his state of mind that he was "very, very happy with what I was doing. I enjoyed my job tremendously. I was making quite a deal of money for my age and position.... I had several girlfriends. I was not hurting in any way." In addition, Lange testified that at no time prior to the accident had he ever taken anti-depressant medication nor undergone psychiatric or psychological counseling or treatment.

Noting that the drugs Lange received in the hospital had been administered well before Lange made the alleged suicide statement, the government argues that "Bonfiglio's testimony that Lange's [alleged suicide statement] was attributable to medications is simply wrong since Lange was not under the influence of any of the [drugs Bonfiglio mentioned] at the time he made the suicide statement." However, there is no evidence in the record delineating the duration of the effect of the drugs Lange ingested the day of the suicide statement. Moreover, even if we were to find some merit to the government's contentions, which we do not, the government failed to introduce any evidence overcoming the compelling record evidence that it was Lange's severe head injury for the most part that was responsible for his confusion and disorientation as well as his subsequent statement concerning the suicide.

The government further asserts that "not a single physician at the Loyola hospital who actually saw the patient ever suggested the possibility that Lange's head injury rendered the [alleged suicide] statement suspect." On this note, we wish to point out that a witness usually does not volunteer answers to questions that have not been asked, and that there is nothing in the record to indicate that either counsel inquired of any Loyola physician (other than Dr. Couch) whether Lange's injury rendered the statement "suspect." According to the testimony of Dr. Bonfiglio, the hospital records indicated to him that "on the nineteenth [the day of the alleged suicide statement], [Lange] was still having significant cognitive problems."

Through focusing on the evidence that would have supported a finding that Lange intentionally caused the accident, the government misconstrues the issue on appeal, which is whether the court's finding that Lange did not attempt to commit suicide by driving into the truck constitutes clear error. The question before us is whether the finding made by the district court is supported by the evidence, and we conclude the evidence supports the district judge's finding on this issue. We reach our conclusion based on the following evidence.

Initially, we observe that Baker, the truck driver, who had a superior view of the roadway due to his position in the elevated truck cab, testified that as the motorcycle approached the intersection, its wheels locked and burned rubber, and its headlight veered back and forth. Thus, it is obvious that Lange was braking the cycle as hard as he could to prevent an accident with the postal truck, which is what every responsible driver is expected to do to avoid impending danger. Michael's mother testified that he was a "happy" person, with a job he liked and "three girlfriends at the time." Likewise, Lange's father, Joseph, testified that prior to the accident, his son "was full of vim and vigor. He was enjoying life to its fullest. He had little or no cares. He had a car, a motorcycle. He had a job and was making good money. He had girlfriends, and all that." And as stated previously, Lange agreed with his parents' statements, thus affirming that he had no intention of killing himself, and testified that prior to the accident he had never taken anti-depressant medication nor undergone psychiatric or psychological counseling or treatment.

Moreover, we observe that Dr. Bonfiglio testified that just six days prior to Lange's

alleged suicide threat, Lange had received a severe head injury requiring the placement of a subarachnoid bolt in his skull to monitor pressure. The doctor also prescribed medications to maintain the patient's coma as the injury to Lange's brain healed while hopefully preventing any increase of pressure in the cranial cavity. Dr. Bonfiglio testified that "most individuals who have a brain injury like this with a period of coma tend not to be a very good historian at the time that they are coming out of coma. They tend to become—they tend to be confused and disoriented[.]" There was ample evidence establishing or tending to establish that Lange was, in fact, confused and disoriented at the time he made the alleged suicide remark. For example, Lange's mother testified that during his recovery at Loyola Hospital, Lange was exhibiting strange behavior (he tried to eat toy plastic raisins, he requested that his best friend leave the room while allowing his friend's mother to remain, and he kissed another friend's hand and told that person that he loved him). Lange's father testified that "[w]hen he came out of the coma, he was very incoherent. He didn't know what had happened" and that throughout his three week stay at Loyola, the conversations he had with his son "certainly weren't lucid." Further, the plaintiff exhibited confusion and disorientation to Dr. Deborah Couch when he told her that he was a psychotherapist. Thus, in contrast to the single report from Nurse Canfield, Dr. Bonfiglio, Lange, and Lange's mother and father all gave testimony establishing that Lange had never acted in a way that would lead one to believe that he intended to take his life.

Finally, we are also cognizant that individuals do not customarily attempt to commit suicide by riding around on their motorcycles after dark waiting for a truck to turn directly into their path. If Lange really wanted to commit suicide, he would have run into a concrete abutment, brick wall, or other immovable object, rather than driving around the city in search of a moving target, i.e. a truck. It is not unusual for patients in the initial stages of recovery from serious and painful injuries to express statements of frustration or anger similar to those made by Lange, such as, "I wish I were dead" or "I want to end it all," even though the patient does or did not genuinely intend to commit suicide.

As we stated in *Ambrosino*, "[w]here there are two permissible views of the evidence, the factfinder's choice cannot be clearly erroneous." *Ambrosino*, 972 F.2d at 784. "[W]here 'the district court's account of the evidence is plausible in light of the record viewed in its entirety,' the reviewing court may not reverse merely because it would have 'weighed the evidence differently'." *Id.* Moreover, Rule 52(a) requires that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." As the trier of fact, it was the district judge who had

> "the best 'opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements,' as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record."

*United States v. Nururdin*, 8 F.3d 1187, 1194 (7th Cir.1993) (citations omitted), *cert. denied*, —— U.S. ——, 114 S.Ct. 1328, 127 L.Ed.2d 676 (1994). In sum, we conclude that we are not left "with the definite and firm conviction that a mistake has been committed[,]" *Savic*, 918 F.2d at 700, and thus hold that the court did not commit clear error in finding that Lange did not attempt to kill himself by colliding with the postal truck.

## II.

■ The government contends that the court committed error in apportioning only forty percent of the total negligence to Lange. It argues that he was negligent as to speed and lookout, and that he did not take evasive action as he approached the intersection. (But we note that if Lange did not keep a proper lookout and failed to see what was plainly in front of him, there would have been no reason for him to slow down, swerve, or take other evasive action.) The government also argues that Lange was a block away from the intersection at the time Baker

commenced his left-hand turn, and therefore Baker did not violate section 11–902 of the Illinois Vehicle Code. *See* 625 ILCS 5/11–902 (vehicle turning left must yield right of way to oncoming traffic).

This case arose under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq. The law which is to be applied is the law of the State of Illinois, "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Savic,* 918 F.2d at 699. With respect to the government's argument that the court committed error in assigning only forty percent of the total negligence to the plaintiff, we note that under Illinois law, "the standard is whether the finding of plaintiff's comparative fault was against the manifest weight of the evidence." *Braglia v. Cephus,* 146 Ill.App.3d 241, 100 Ill.Dec. 106, 110, 496 N.E.2d 1171, 1175 (1986). The fact finder's allocation of fault "is against the manifest weight of the evidence 'where it is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary, unreasonable, and not based upon the evidence. When considering whether a verdict was contrary to the manifest weight of the evidence, a reviewing court must view the evidence in the light most favorable to the appellee.'" *Id.* (quoting *Ford v. City of Chicago,* 132 Ill.App.3d 408, 87 Ill.Dec. 240, 476 N.E.2d 1232 (1985)).

The district judge determined that "in failing to reduce speed," Lange violated section 11–601(a) of the Illinois Vehicle Code, which in part states:

> General speed restrictions. (a) No vehicle may be driven upon any highway of this State at a speed which is greater than is reasonable and proper with regard to traffic conditions and the use of the highway, or endangers the safety of any person or property. The fact that the speed of a vehicle does not exceed the applicable maximum speed limit does not relieve the driver from the duty to decrease speed when approaching and crossing an intersection....

625 ILCS 5/11–601(a). In addition, the trial judge concluded that Baker, "in making his left turn off of Roosevelt onto Laramie, violated" section 11–902, which provides:

> Vehicle turning left. The driver of a vehicle intending to turn to the left within an intersection ... shall yield the right of way to any vehicle approaching from the opposite direction which is so close as to constitute an immediate hazard, but said driver, having so yielded may proceed at such time as a safe interval occurs.

625 ILCS 5/11–902.

In arguing that the court erroneously found Baker to be in violation of section 11–902 by failing to yield the right of way to Lange, the government relies on Baker's deposition testimony that at the time he initiated his left-hand turn, Lange was a city block east of the intersection. The trial judge, however, was not required to and obviously did not believe Baker's account concerning Lange's position on the roadway, finding that "his testimony was confusing and was contradicted by the eyewitnesses." Rather, the court, after observing Bogdan's demeanor and assessing his credibility, credited Bogdan's testimony that Lange was only a mere "thirty or forty feet" east of the intersection when Baker began the left-hand turn and therefore "constitute[d] an immediate hazard" to Baker. *See Levin v. Welsh Bros. Motor Serv., Inc.,* 164 Ill.App.3d 640, 115 Ill.Dec. 680, 518 N.E.2d 205 (1987) (upholding finding that it was negligent for a vehicle to make a turn at ten miles per hour when an approaching vehicle was seventy to eighty feet from the intersection); *Cowan v. Wheeler,* 76 Ill.App.3d 259, 32 Ill.Dec. 85, 395 N.E.2d 32 (1979) (holding that an approaching vehicle, thirty feet away and travelling at thirty miles an hour, was within the zone of an "immediate hazard"). Thus, we conclude the court did not commit error in determining that Baker was sixty percent negligent for failing to yield the right of way to Lange. Moreover, we are of the opinion that the district judge's determination that Lange was forty percent negligent was not "against the manifest weight of the evidence," for, as we have discussed above, Baker failed to yield the right of way to Lange by initiating his left-hand turn when Lange was but thirty or forty feet from the intersection. We hold the court's allocation of fault was proper.

*CONCLUSION*

The judgment is AFFIRMED.